324 P.3d 876

STATE of Hawai'i, Respondent/Plaintiff–Appellee,

v.

John WALTON, Petitioner/Defendant–Appellant.

No. SCWC–11–0000667.

Supreme Court of Hawai'i.

Feb. 14, 2014.

Richard S. Kawana, Honolulu, for petitioner.

Stephen K. Tsushima, Honolulu, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, McKENNA, and POLLACK, JJ.

OPINIONS OF THE COURT

This case arises from an incident in which a taxi driver (complaining witness or "CW") was stabbed and robbed after transporting John Walton and Courage Lee Elkshoulder to Manoa Valley. According to the State, after CW drove Walton and Elkshoulder to Manoa, Elkshoulder grabbed CW from behind and stabbed him in the neck; Walton assisted in the attack by reaching over from the rear passenger-side seat and holding CW down.

Police recovered a backpack from CW's taxi, searched the backpack pursuant to a warrant, and recovered a General Nutrition Center (GNC) membership card. Police then contacted GNC and learned that the card was registered in Walton's name. Police also obtained a surveillance video depicting two men crossing the street near where CW had picked up Walton and Elkshoulder. Images from this video were posted on online news sites and shown on the evening news. Police received tips identifying the men in the images as Walton and Elkshoulder and several coworkers identified Walton and Elkshoulder as the men in the images.

The State indicted both Walton and Elkshoulder for Attempted Murder in the Second Degree and Robbery in the First Degree. The Circuit Court of the First Circuit[1] consolidated Walton's and Elkshoulder's trials, and subsequently denied both Walton's and Elkshoulder's motions for severance.

During trial, the State maintained that Elkshoulder stabbed CW while Walton held him down. Elkshoulder and Walton, however, advanced irreconcilable defenses. Specifically, Elkshoulder testified that he was not in the taxi when CW was stabbed. Elkshoulder also introduced a recorded telephone conversation that he had made, in which Walton admitted to stabbing CW. The State argued the recording was not worthy of belief. On the other hand, Walton elicited testimony from CW that it was Elkshoulder who stabbed him. In other words, Walton and Elkshoulder each argued that the other had stabbed CW. The jury found Walton guilty of both Attempted Murder in the Second Degree and Robbery in the First Degree, but found Elkshoulder guilty of only Assault in the First Degree and Robbery in First Degree.

The circuit court sentenced Walton to a life term of incarceration with the possibility of parole for Attempted Murder in the Second Degree and dismissed the robbery charge without prejudice because the jury found that the two offenses had merged, and Walton brought the instant appeal. The Intermediate Court of Appeals affirmed the circuit court's judgment of conviction and sentence.

Walton argues that the circuit court erred in: (1) denying Walton's motion for severance; (2) denying Walton's motion to suppress evidence (i.e., the information obtained from GNC) and identification testimony (i.e., the identification of Walton and Elkshoulder by their co-workers); (3) admitting the recorded telephone conversation; (4) limiting Walton's cross-examination of Elkshoulder concerning the making of the recording; (5) instructing the jury; and (6) denying Walton's motion for judgment of acquittal.

We hold that, on the facts of this case, the circuit court erred in denying Walton's motion for severance. Walton was forced, in effect, to defend against two prosecutors with two different theories of his guilt. The State argued that Walton assisted Elkshoulder by holding CW down, while Elkshoulder argued that it was Walton who stabbed CW. Elkshoulder relied on the recorded telephone conversation in support of his theory, and that evidence appears to have been persuasive. Despite the State's theory of the case, and CW's testimony in support of that theory, the jury—after hearing Walton's admission on the recording—convicted Walton of attempted murder, but convicted Elkshoulder only of assault in the first degree. In these circumstances, Walton was prejudiced and denied a fair trial. The circuit court therefore should have granted Walton's motion for severance. Accordingly, we vacate the ICA's and the circuit court's judgments, and remand Walton's case for a new trial.

---

1. The Honorable Michael A. Town presided until October 1, 2010, when the case was re-assigned to the Honorable Colette Y. Garibaldi.

Because our resolution of this issue is dispositive, we do not consider several of Walton's other arguments. We do, however, address Walton's arguments that the circuit court erred in denying his motion to suppress evidence and identification testimony and in instructing the jury, because those issues may arise again on remand in Walton's separate trial. We also conclude that because sufficient evidence supported the jury's verdict, the circuit court did not err in denying Walton's motion for acquittal.

## I. Background

The following factual background is taken from the record on appeal.

On April 8, 2009, the State indicted Walton for Attempted Murder in the Second Degree, in violation of HRS §§ 705–500,[2] 707–701.5,[3] and 706–656[4]; and Robbery in the First Degree, in violation of HRS § 708–

2. HRS § 705–500 provides that:
(1) A person is guilty of an attempt to commit a crime if the person:
(a) Intentionally engages in conduct which would constitute the crime if the attendant circumstances were as the person believes them to be; or
(b) Intentionally engages in conduct which, under the circumstances as the person believes them to be, constitutes a substantial step in a course of conduct intended to culminate in the person's commission of the crime.
(2) When causing a particular result is an element of the crime, a person is guilty of an attempt to commit the crime if, acting with the state of mind required to establish liability with respect to the attendant circumstances specified in the definition of the crime, the person intentionally engages in conduct which is a substantial step in a course of conduct intended or known to cause such a result.
(3) Conduct shall not be considered a substantial step under this section unless it is strongly corroborative of the defendant's criminal intent.

3. HRS § 707–701.5 provides:
(1) Except as provided in section 707–701, a person commits the offense of murder in the second degree if the person intentionally or knowingly causes the death of another person.
(2) Murder in the second degree is a felony for which the defendant shall be sentenced to imprisonment as provided in section 706–656.

4. HRS § 706–656 provides, in relevant part:
(2) Except as provided in section 706–657, pertaining to enhanced sentence for second degree murder, persons convicted of second

840(1)(b)(i).[5] The State indicted Elkshoulder for the same offenses on November 26, 2008.

### A. Consolidation of trials

The State filed a motion to consolidate the trials of Walton and Elkshoulder, stating that the charges involved the same conduct or series of acts and were connected by a single scheme or plan. The State explained that the only reason Walton and Elkshoulder were charged separately was that police had been unable to locate both defendants at or near the same time. This was a result of the fact that Elkshoulder turned himself in to authorities approximately one week after the incident, while Walton fled the state and was not apprehended until mid-March 2010.

The circuit court held a hearing on the consolidation motion, to which both Walton and Elkshoulder objected. During the hearing, Walton's counsel stated that he had just been informed of a recorded telephone con-

degree murder and attempted second degree murder shall be sentenced to life imprisonment with possibility of parole. The minimum length of imprisonment shall be determined by the Hawaii paroling authority; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.
If the court imposes a sentence of life imprisonment without possibility of parole pursuant to section 706–657, as part of that sentence, the court shall order the director of public safety and the Hawaii paroling authority to prepare an application for the governor to commute the sentence to life imprisonment with parole at the end of twenty years of imprisonment; provided that persons who are repeat offenders under section 706–606.5 shall serve at least the applicable mandatory minimum term of imprisonment.

5. HRS § 708–840(1)(b)(i) provides, in relevant part:
(1) A person commits the offense of robbery in the first degree if, in the course of committing theft or non-consensual taking of a motor vehicle:
. . .
(b) The person is armed with a dangerous instrument and:
(i) The person uses force against the person of anyone present with intent to overcome that person's physical resistance or physical power of resistance[.]

versation between Walton and Elkshoulder in which Walton allegedly made incriminating statements.[6] Walton argued that the recording presented a problem under *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).[7] The circuit court granted the State's motion to consolidate, subject to review in pretrial motions.

Before the start of trial, Walton filed a motion for severance, arguing that his rights to confrontation, effective assistance of counsel, and due process of law would be violated by a joint trial. Walton argued that Elkshoulder, using the recorded telephone conversation, would contend that it was Walton who had stabbed CW. Walton argued that because the recording appeared to directly implicate him, his defense conflicted with that of Elkshoulder. The State filed an opposition to the motion, arguing that the recorded phone conversation included Walton's own statements and that Walton's voice had been verified by two of Walton's co-workers, Jeremy Koki and Matthew Rodrigues. The circuit court denied Walton's motion to sever.

On the eve of trial, Elkshoulder filed a motion to sever his and Walton's trials, in which Walton joined, arguing that Elkshoulder would be prejudiced if the State argued that the defendants had engaged in a conspiracy or mutual agreement in making the recording. The circuit court denied the motion.

After trial began, Walton again moved for severance, arguing that the strategies adopted by himself and Elkshoulder were inconsistent and contradictory, and that a joint trial would deprive him of a fair trial. The circuit court denied the motion, stating that no additional information had been presented that would warrant reversal of the prior ruling denying severance.

After trial, the circuit court issued its Findings of Fact and Conclusions of Law and Order denying severance of trials, finding that Walton and Elkshoulder failed to present any new information that had not already been presented to the circuit court when it consolidated the trials. The order also stated that joinder would not be unfair to either defendant. Specifically, the order stated that the recording did not present a *Bruton* issue because "[u]nlike *Bruton*, this phone conversation is not a statement made by a non-testifying co-defendant which implicates a defendant in a joint trial." (Emphasis added).

The order further explained that:

[n]either defendant is being prevented from producing evidence which would have otherwise been inadmissible in their separate trials. Had Defendant Walton gone to trial separately, the State could still introduce the taped phone conversation against Walton as his own statement.... Although both defendants may attempt to point the finger at the other, the Court does not find this irreconcilable. There is other evidence that this court may consider and in its discretion finds that these matters should be tried together.

### B. Suppression of Identification and Evidence

Walton also filed a motion to suppress evidence and identification testimony. Specifically, Walton sought to suppress the identification testimony of Jeremy Koki and Matthew Rodrigues, who identified Walton in still photos taken from a surveillance video recorded on the day of the incident, and in a photographic lineup array. Walton argued that Rodrigues's and Koki's identifications were the result of impermissibly suggestive procedures and not reliable because Rodrigues and Koki had previously viewed surveillance photos of persons identified by the news media as alleged suspects in the incident and discussed with others their belief that Walton was depicted in those photos.

Walton also sought to suppress information police obtained using a registration number on the GNC card recovered from the backpack found in CW's taxi. Walton acknowledged that police obtained a warrant to search the backpack, but argued that police

---

6. As discussed *infra*, this recording was made by Elkshoulder.

7. In *Bruton,* the United States Supreme Court held that a defendant is deprived of the Sixth Amendment right of confrontation when an incriminating statement of a non-testifying co-defendant is introduced at their joint trial. 391 U.S. at 126, 88 S.Ct. 1620.

were required to secure an additional warrant to obtain from GNC any information associated with the card's registration number.

The State opposed Walton's motion, stating that the identification procedures used were not unfair or inherently suggestive, because both Koki and Rodrigues had worked with Walton and Elkshoulder for nearly a year, were very familiar with Walton's and Elkshoulder's appearances and personal information, and had already recognized Walton and Elkshoulder in news reports showing the surveillance photos and video before being contacted by police to confirm the identities of Walton and Elkshoulder in photo lineups. The State argued that Koki's and Rodrigues's familiarity with Walton and Elkshoulder supported an unequivocal recognition of them both in the surveillance images and photographic lineups. The State noted that Walton and Elkshoulder were captured on surveillance video while at the corner of Pensacola and Young streets—the approximate location where CW told police he picked up Walton and Elkshoulder—and that police provided the images to television news stations, which broadcast the images. According to the State, police subsequently received an anonymous call identifying the men in the images as Walton and Elkshoulder, and stating that they worked for the Hawaiʻi Medical Service Association (HMSA). Police then contacted HMSA to speak with anyone who might be familiar with Walton or Elkshoulder.

Regarding the information obtained using the GNC card, the State argued that the police's contact with a GNC store to ascertain ownership of the card based on the card's registration number was allowable under the warrant police obtained to search the backpack found in CW's taxi, which contained the card.

During a hearing on Walton's motion, Rodrigues testified that on November 20, 2008, he went to a news website to view photos of two men accused of a crime, after his supervisor called him and told him to check out the news. Rodrigues testified that he believed his supervisor told him that Elkshoulder and Walton might be depicted in the video.

Rodrigues explained that he was a quality assurance coordinator for HMSA, and that he had supervised Walton for about five months and Elkshoulder for about seven months. Rodrigues testified that he looked at the photos on the website about 20 times and consulted with his family, who had met Elkshoulder. At first, Rodrigues thought that the online images did not depict Walton and Elkshoulder. However, by the time Rodrigues saw the images on the evening news, it was clear to him that Walton and Elkshoulder were the men depicted in the images. Rodrigues testified that he was able to identify Walton based on his stature, his overall appearance, the style of his hair, his glasses, and his backpack.

Rodrigues further testified that a day or two later, police contacted him and showed him the same surveillance photo. About a month after that, Rodrigues was again contacted by police to view a photographic lineup, from which he identified Walton.

Koki [8] testified that he worked for HMSA and that in November 2008, he received a phone call telling him to look at a surveillance photo in an online news report. The person told Koki, "I think it's one of your guys" but did not identify the person depicted in the photo by name. Koki stated that he looked at the online photo about ten times over ten minutes, after which he called his manager and stated that he believed the men depicted in the photo were Walton and Elkshoulder. Koki testified that he concluded on his own that it was Elkshoulder and Walton in the photo.

Koki further testified that he viewed the photo repeatedly because he did not want to believe that it was Walton and Elkshoulder in the photo, but that after he was confident that it was them, he decided to report it to his manager. Koki identified Elkshoulder in the photo by his clothing and hair, and identified Walton by his hair and backpack. Koki stated that almost a month later, he identified Walton and Elkshoulder from a lineup of photos.

HPD Detective Michael Ogawa testified that he prepared a photographic lineup using

8. Koki did not testify at trial.

photos from Hawai'i driver's licenses and state IDs, and showed them to Rodrigues, Koki, and Richard Laumauna, another of Walton's co-workers.[9] Detective Ogawa also showed Koki and Rodrigues photographs taken from the surveillance video.

Detective Ogawa explained that CW identified the two men in the surveillance photo as the men who were involved in the incident. Although CW was able to identify Elkshoulder from a photo lineup, he was unable to identify Walton.

Detective Ogawa further testified that another detective obtained a search warrant to search the contents of the backpack found in CW's taxi. Detective Ogawa explained that the GNC card was found in the backpack, and described the card as a rewards card attached to a key ring. Detective Ogawa further explained that the GNC card did not have a name on it, but that it had an identification number, which he provided to GNC to determine who might be associated with the number.

The circuit court denied Walton's suppression motion. The circuit court found that Koki and Rodrigues identified Walton and Elkshoulder independently as a result of their familiarity with Walton and Elkshoulder, and that the photo lineup had not been impermissibly suggestive. The order noted that Koki and Rodrigues saw the surveillance images of Walton and Elkshoulder shown by news media the day before they were contacted by police to identify Walton and Elkshoulder, and that police did not know Koki and Rodrigues had seen the photos. Specifically, the order explained that:

> [e]ach of the witnesses identified Elkshoulder and Walton independently as a result of their contact with defendants. The fact that the photos used in the photo lineup array [are] pictures of the defendants not in the video stills, but pictures of them as they appeared on different dates and times (i.e., photos from driver's license or state identification cards) is not impermissibly suggestive.

The circuit court also concluded that the police inquiry to establish ownership of the GNC card found in the backpack was within the scope of the search warrant and that the card was not a closed container requiring an additional warrant.

## C. Recording of telephone conversation

Prior to trial, the circuit court held an HRE Rule 104 hearing regarding the recorded telephone conversation between Elkshoulder and Walton. Elkshoulder indicated that he would offer parts of the recording into evidence as exceptions to the hearsay rule, as an admission by a party-opponent, or as a statement against interest.

Walton objected to the admission of the entire transcript of the recording and the recording itself, arguing that the recording was irrelevant, prejudicial, and that its admission would violate Walton's right of confrontation. The circuit court ruled that it would admit certain portions of the recording, including the portion in which Walton stated that he stabbed CW two to three times. The circuit court stated that it would address confrontation and evidentiary issues at trial.

## D. Trial

### 1. State's Case–in–Chief

CW testified that on November 15, 2008 at approximately 1:00 p.m., two men approached him outside his taxicab near the corner of Pensacola and Young streets and requested a ride. There is no dispute that the two men were Walton and Elkshoulder. CW agreed to give Walton and Elkshoulder a ride, and they entered his taxi. Elkshoulder sat in the rear seat directly behind CW, and Walton sat in the rear seat on the passenger side. At their request, CW drove the men to Manoa.

As the taxi approached Manoa, Elkshoulder asked CW the cost of a fare to Waianae, and whether CW had change for a $100 bill. CW responded that he was not sure if he had

---

9. Walton did not seek to suppress the testimony of Laumauna, who also testified during the suppression hearing that he met with Detective Ogawa and identified Walton and Elkshoulder as the men depicted in the surveillance photos. Laumauna also identified Walton in a photo lineup, based on his familiarity with Walton as a coworker.

change, and Elkshoulder told CW that he would not need change. Walton was on a cell phone during much of the ride and did not speak to CW. Elkshoulder directed CW to drive to a park in Manoa, then changed his mind and said he wanted to go to his sister's home. Eventually, the taxi reached a dead-end street, and Elkshoulder told CW to stop because they had arrived at his sister's house. CW then stopped the taxi and reached to his right to stop the taxi meter.

CW testified that as he turned his head to the right, a left arm grabbed him around the neck from directly behind, and he was cut on the right side of his neck. CW was certain that Elkshoulder had stabbed him, because, at the time, he saw Walton still seated on the rear passenger side of the taxi. CW testified that both men then pinned him down between the two front seats. CW was facing the ceiling of the car and could see both men pinning him down. CW then saw another hand start stabbing him a few more times with a knife. CW grabbed the knife with his left hand, which was cut as he struggled with the person holding the weapon. CW did not see who was holding the knife, but saw three hands trying to pin him down while a fourth hand was trying to stab him. CW was unsure exactly how the struggle ended. The two men opened the rear doors of the taxi, exited and ran.

When police arrived at the scene, they recovered various pieces of evidence, including two knives. One knife was found in the taxi behind the driver's seat. The second knife was found under the taxi, closer to the driver's side of the vehicle. The police also recovered a backpack from inside the taxi. The police obtained a search warrant to search inside the backpack, and its contents included the GNC card.

CW explained that, following the attack, about $90 to $100 was missing from one of his pants pockets, and that his wallet was also missing from another pants pocket. However, CW also testified that he received his wallet and cell phone from the hospital when he was discharged a few days later.

Detective Ogawa testified that on November 17, 2008, he reviewed evidence recovered from the backpack pursuant to a search warrant, including the GNC card and a Power-

house Gym membership card. Detective Ogawa called the Ala Moana branch of GNC, provided the store with the number that was printed on the GNC card, and GNC provided him with a name associated with the card. Detective Ogawa also called Powerhouse Gym, which provided him with a name associated with the gym membership card. The GNC card was associated with Walton and the Powerhouse Gym card was associated with Elkshoulder.

Detective Ogawa testified that he showed CW the photos from a surveillance video taken near the corner where CW had indicated he picked up the passengers who attacked him. CW identified the men in the photos as the passengers who attacked him, and Detective Ogawa then released copies of the photos to news media via Crime Stoppers. Detective Ogawa then received tips via Crime Stoppers identifying Walton and Elkshoulder. The tips also revealed that Walton and Elkshoulder worked for Staffing Partners as temporary workers in the HMSA building. Detective Ogawa contacted a Staffing Partners employee who confirmed that Walton and Elkshoulder were employees of the company. Detective Ogawa then contacted HMSA and interviewed Koki, Rodrigues, and Laumauna. Detective Ogawa showed the surveillance photos to Koki and Rodrigues, who identified Walton and Elkshoulder. Detective Ogawa also showed Koki and Rodrigues photographic lineups that included state identification photos of Walton, Elkshoulder and others with similar appearances. Koki and Rodrigues each identified Walton and Elkshoulder from the lineups.

Rodrigues testified that he worked at HMSA and supervised both Walton and Elkshoulder. On approximately November 18, 2011, Rodrigues's supervisor, Koki, directed him to view photos on an online news site to try to determine who was in the photos. Rodrigues recognized Elkshoulder and Walton in the photo, but he did not want to believe that it was them. Rodrigues looked at the photo on the news site repeatedly because it appeared fuzzy, but seeing a clearer image on the evening news confirmed to him that the men in the photo were Elkshoulder and Walton.

Rodrigues testified that Elkshoulder called him on November 19, 2011, and Rodrigues asked Elkshoulder if he knew his face was being shown on the news. According to Rodrigues, Elkshoulder responded that "he's sorry, that he messed up" and that "[t]hings weren't supposed to go down that way." Elkshoulder also told Rodrigues that he did not mean to hurt anybody.

Rodrigues further testified that Elkshoulder and Walton always worked together, arrived together, and left together. According to Rodrigues, Elkshoulder seemed like an adult leader and Walton seemed like a follower who was young and clueless. Elkshoulder would tell Walton what to do, and Walton would listen and not argue. On cross-examination by Elkshoulder, Rodrigues stated that during his telephone conversation with Elkshoulder, Elkshoulder did not discuss details of the incident involving CW, or refer to who stabbed anyone.

Laumauna testified that he worked with Elkshoulder and Walton at HMSA, and that he had invited them to his grandniece's birthday party at Ala Moana Beach Park on November 15, 2008, but that neither Elkshoulder nor Walton attended. While Laumauna was at the party that day, he received a call from Elkshoulder, who asked him for a ride from his sister's house in Manoa. Elkshoulder told Laumauna that "they" needed a ride from Manoa, which Laumauna understood to mean that Walton was with Elkshoulder. Laumauna did not pick up Elkshoulder because he was hosting the party. In court, Laumauna was shown one of the surveillance video photos, and he identified the two men in the photo as Elkshoulder and Walton.

Trauma surgeon Frederick Yost, M.D. testified that he treated CW for two stab wounds to the neck. Dr. Yost testified that CW also suffered lacerations on his right forearm and left hand and a puncture wound on his right hand. On cross-examination, Dr. Yost testified that one of CW's neck wounds could have caused death if untreated, but that death from his other wounds was unlikely.

After the State rested, Walton and Elkshoulder each moved for a judgment of acquittal. The circuit court denied the motions.

## 2. Elkshoulder's defense

Elkshoulder testified in his own defense. Elkshoulder stated that on November 15, 2008, he had planned to go to Laumauna's grandniece's birthday party at Ala Moana Beach with Elkshoulder's girlfriend and her friend. According to Elkshoulder, Walton showed up unexpectedly at Elkshoulder's apartment at around 11:30 a.m. According to Elkshoulder, Walton told him that he needed a place to stay, and asked if he could stay with Elkshoulder, who declined. At some point, Elkshoulder's girlfriend no longer wanted to go to the party, so, at about 12:30 p.m., Elkshoulder and Walton began walking down Pensacola Street toward Ala Moana.

According to Elkshoulder, Walton suggested catching a taxi to go and get some money from a friend, at which point Walton approached CW's taxi and asked for a ride. Elkshoulder testified that Walton directed CW where to go. According to Elkshoulder, when the taxi stopped in Manoa, "it just happened real fast." Elkshoulder explained that Walton whispered to him to "get my back," and Elkshoulder thought that Walton was going to run out of the taxi without paying. Elkshoulder testified that Walton then jumped on CW, at which point Elkshoulder exited the taxi. Elkshoulder stated that once he exited the taxi he walked away at a fast pace but did not run. Elkshoulder stated that he heard the taxi's horn honking repeatedly, and looked back and saw the taxi shaking. According to Elkshoulder, Walton exited the cab from the back driver's side. Elkshoulder testified that he continued walking, heard running behind him, turned and saw Walton running toward him. Elkshoulder stated that he began to run away because he saw what looked like blood on Walton's shirt and shorts. Elkshoulder stated that Walton followed him into a small ravine, and that the following exchange occurred:

> I turned to him and just the look on his face and he said I can't believe it, I can't believe it. And I said what and he said I stabbed him, I stabbed him. And my—my heart just sank when I heard him say that, especially when I put together that what was on him when he came out was blood.

And I didn't know if [CW] was—I didn't know what happened to him, if he was still alive or whatever.

Elkshoulder stated that he kept walking and wanted to get away from Walton. Elkshoulder stated that he called Laumauna to ask for a ride, and that Laumauna said he was busy setting up at the party. According to Elkshoulder, he walked from Manoa to Kapiolani Park and stayed there for several days. On November 17, 2008, Elkshoulder walked to Walton's girlfriend's house, told Walton he planned to turn himself in to police, and urged Walton to turn himself in. Elkshoulder stated that Walton refused to turn himself in and said he would leave, but did not say where he would go.

Elkshoulder testified that Rodrigues called him a few days after the incident, and informed Elkshoulder that his face was "all over the news and the paper." Elkshoulder testified that he told Rodrigues: "I didn't have anything to do with it. I messed up by going with John Walton and that was it." Elkshoulder further testified that he told Rodrigues that "[i]t wasn't supposed to happen that way, I didn't know it was going to happen that way," and that "I said I didn't hurt anybody and I would never mean to hurt anybody." Elkshoulder turned himself in to authorities and was arrested on November 21, 2008.

According to Elkshoulder, Walton called Elkshoulder's cell phone on November 17, 2009 at about 10:00 a.m. from a number with a Kansas area code. Elkshoulder told Walton that he was busy and to call back in the evening. After hanging up, Elkshoulder immediately called his attorney, a deputy public defender (DPD).[10] After consulting with the DPD, Elkshoulder obtained a tape recorder and audio tape. Elkshoulder stated that his purpose for getting the tape recorder was to get Walton's side of the story and "[t]he truth of what happened that day."

Walton called back that evening, while Elkshoulder was at his parents' home. Elkshoulder put his cell phone on speaker mode and began to record his conversation with Walton. Elkshoulder stated that he did not record the entire conversation, because the cassette tape had 60 minutes of recording capacity and he did not want to waste any recording space on small talk. Consequently, there were gaps in the tape that indicated times when Elkshoulder turned the recorder on and off. Elkshoulder identified his Exhibit C as an accurate but edited and shortened version of the taped recording. Elkshoulder offered it into evidence, upon which Walton requested and conducted a voir dire examination.

During the voir dire examination, Walton asked Elkshoulder about his conversation with the DPD prior to making the cassette recording. The DPD objected and, at a bench conference, stated that such questioning infringed on the attorney-client privilege. Walton argued that the DPD had made himself a witness to how the recording was made. Walton also complained that the recording was not authenticated by any means other than Elkshoulder's self-serving statements. Walton asked the circuit court to allow questioning of the DPD about his involvement in producing the recording.

The State agreed with Walton that the DPD had made himself a witness in this case by trying to introduce the recording. The DPD stated that he was not a witness because he was not present when the recording was made. The DPD also argued that an adequate foundation was laid for the recording, and that Walton's and the State's arguments went to the weight of the evidence rather than its admissibility. The circuit court stated that it would be a fair line of questioning to ask Elkshoulder why the tape had been made, but that the DPD could not be questioned as a witness.

Walton argued that the DPD made himself a witness by being directly involved in transferring the tape to CD format. Walton argued that he should be able to inquire about the conversation the DPD had with Elkshoulder prior to the making of the recording.

Walton filed a memorandum in support of his request to question Elkshoulder regarding his discussions with the DPD regarding the recording. The court sustained Elkshoulder's objection as to attorney-client

10. The same DPD served as Elkshoulder's trial attorney in the instant case.

communications, but ruled that Elkshoulder was subject to cross-examination concerning his purpose and motive for recording the conversation, and concerning various copies of the recording. The circuit court stated that Elkshoulder laid a proper foundation for the recording, and also stated that prior to trial, the court listened to the original CD recording and the enhanced CD recording several times to evaluate the content of the recording. The circuit court stated that Walton had no legitimate need to determine what was communicated between Elkshoulder and the DPD concerning the taped conversation.

The circuit court further ruled that Walton's inquiries regarding whether the contents of the recording that were transferred to the CD went to the weight of the evidence and noted that Elkshoulder had made himself subject to cross-examination. The circuit court noted that all copies of the recording had been available for weeks prior to trial to both the State and Walton's counsel to listen to and compare. The circuit court further stated that Walton had moved to continue the trial date on more than one occasion for the specific purpose of conducting tests on the recording and had never filed a timely motion regarding the recordings.

The CD version of the recording was entered into evidence over objections by Walton and the State. The court instructed the jury that the recording included portions of a telephone conversation between Elkshoulder and Walton, noted that the recording had been edited by the court, instructed that the jury must not speculate about what may have been edited out, and explained that the recording would be available to the jury to listen to during deliberations. The recording was then played for the jury.

The recording included the following exchange:

ELKSHOULDER: Dude ... Dude ... how many times did you stab that guy, do you remember ... between you and me ...

WALTON: I think 2–3 times ...

ELKSHOULDER: Oh ... okay ... well, the thing is this ...

WALTON: I just remember stabbing like to the side ... but 2–3 times.

Elkshoulder testified about the recording on direct examination as follows:

BY DPD: Okay.... [S]o when you made these recordings, why did you make these recordings?

A: I wanted the truth to come out. I wanted to basically just the truth to come out.

Q: Is there a way that you had planned to converse with [Walton] during these conversations?

A: No. When he called me the first time, that's when I called you ... and then we—we consulted. And then the second time it wasn't a plan, it was just a matter of him calling and just recording and trying to really put Mr. Walton at ease. And when I say at ease, there were some things that I had to say that were not true.

Q: Like what?

A: I told him I took the heat for both of us. Again, I hadn't talked to him in a year, I didn't know where he was except for the 785 area code, even [if] it was his phone. So, again, with respect to the recording of the conversations that we had, there were other things in there, again to put him at ease, I had to say that were not true.

Q: So the first recording, this was—well, the first phone call was, again, what day?

A: November 17th and that was in the morning—

Q: Yeah.

A:—on or around about 10 AM. And the second phone call was the same day that evening.

Q: Okay. The second phone call you called him or he called you?

A: He called me.

On cross-examination by Walton, Elkshoulder acknowledged that the backpack found in CW's taxi had his name written on it, but testified that he had given the backpack to Walton more than one month before the incident. Elkshoulder said a hair-band and computer flash drive that police found in the backpack belonged to him, but that he did not know whether a Powerhouse Gym

membership card found in the backpack was the one Walton had given to him.[11]

On cross-examination by the State, Elkshoulder testified that he immediately exited the taxi when Walton jumped on CW because he was scared, but acknowledged that he did not see Walton with a knife or other weapon. According to Elkshoulder, when he was 30 or 40 feet away from the taxi, he heard its horn honking, turned, and saw Walton running toward him, then Elkshoulder began running while Walton began calling his name. Elkshoulder stated that he saw blood on Walton's shorts and shirt.

Elkshoulder further testified that he later spoke to Rodrigues on the telephone and told him that he did not mean for anyone to get hurt and that he "didn't have anything to do with it." Elkshoulder stated that he recorded his conversation with Walton because Elkshoulder wanted the truth to come out.

### 3. Walton's Defense

Walton did not present evidence or testimony.

### 4. State's Rebuttal

The State recalled Rodrigues, who testified that when he spoke to Elkshoulder on the telephone regarding Elkshoulder's face being on the news, he was certain that Elkshoulder did not say "I didn't have anything to do with it."

### 5. Jury Instructions

On May 27, 2011, Walton joined Elkshoulder's running objection to all jury instructions as to the charged offenses and lesser included offenses, arguing that the words "as a principal" should be added to clarify that the instructions regarding substantive offenses apply to a defendant charged as a principal rather than as an accomplice. Walton also joined Elkshoulder's objection to the circuit court's instruction regarding accomplice liability,[12] asserting a need to clarify and emphasize that the intent to promote or facilitate the commission of a specific offense was

required. The circuit court approved the jury instructions over the above objections and so instructed the jury. Specifically, the court instructed the jury with regard to Attempted Murder in the Second Degree as follows:

A person commits the offense of Attempted Murder in the Second Degree if he intentionally engages in conduct which, under the circumstances as he believes them to be, is a substantial step in a course of conduct intended or known to cause the death of another person.

There are two material elements of the offense of Attempted Murder in the Second Degree, each of which the prosecution must prove beyond a reasonable doubt.

These two elements are:

1. That on or about November 15, 2008, in the City and County of Honolulu, State of Hawai'i, the Defendant John Walton intentionally engaged in conduct; and

2. That the conduct, under the circumstances as defendant believed them to be, was a substantial step in a course of conduct intended or known to be practically certain by the defendant to cause the death of another person.

Conduct shall not be considered a substantial step unless it is strongly corroborative of the defendant's intent to commit Murder in the Second Degree, which is intentionally or knowingly causing the death of another person.

The circuit court also instructed the jury on the lesser included offenses of Assault in the First Degree, Assault in the Second Degree, Assault in the Third Degree, and Reckless Endangering in the Second Degree and similarly did not include the words "as a principal" in those instructions.

Finally, the court instructed the jury with regard to accomplice liability as follows:

A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the com-

---

11. The State subsequently obtained a stipulation from Walton and Elkshoulder that HPD Detective Ogawa would testify if recalled that on November 17, 2008, he contacted Powerhouse Gym owner Alvin Paguio regarding a gym membership card found in the backpack discovered in

CW's taxi, and that Paguio told Ogawa that the name the gym associated with a membership number on the card was Elkshoulder.

12. Specifically, Walton and Elkshoulder objected to Court's Supplemental Instruction No. KK.

mission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.

A person is an accomplice of another in the commission of an offense if:

1. With the intent to promote or facilitate the commission of the offense he

a. solicits the other person to commit it; or

b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.

Mere presence at the scene of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if the person plans or participates in the commission of an offense with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

### 6. Closing arguments

The State argued that both Walton and Elkshoulder participated in the stabbing incident. The State summarized CW's testimony:

Who stabbed you? There were only three people in the car. [CW] was in the front, the two defendants in the back. Who stabbed you? The Asian guy. Are you absolutely certain? Yes, it was the Asian guy. Who held you down with both hands while the knife is being pushed down on you? He talks about the shorter guy, meaning [ ] Walton, pushing him down while he still saw the knife over him. [CW] says there were three hands on me and one hand holding the knife.

The State further argued that although there was "no doubt" that the recorded phone conversation was between Elkshoulder and Walton, "the circumstances under which they took place [were] highly suspect" because at the time of the recording, Elkshoulder was awaiting trial and Walton was "nowhere to be found."

The State also highlighted testimony about Elkshoulder being "the leader and [Walton] being the follower," and argued that Walton was guilty as an accomplice.

[W]e don't need to prove who was the principal and who was the accomplice.

The charge is Attempted Murder in the Second Degree, one or both of them stabbed him and one or both of them helped each other.

Now, [ ] Elkshoulder has accused [ ] Walton of doing it and he uses this tape. [ ] Walton says yeah, I stabbed him two to three times. On the assumption that you find the tape credible and you believe that [ ] Walton is actually the person who stabbed the taxicab driver, [CW], two to three times, he says that right on the tape and you have that tape before you, [ ] Elkshoulder was still there and still held.

If [CW] was mistaken in who actually stabbed him, certainly he was not mistaken that both of them were in the car, two sets of hands were on him.

Now, when the defense of [ ] Elkshoulder presents this tape to you he talks about how many times did you stab, two to three times. But listen to that tape some more as you hear [ ] Walton saying, you know, he's saying they're talking about the honking of the horn. [ ] Walton says, you know, this whole F-ing thing, the honking of the horn, and then—and then me and you skip out. Then me and you skip out. Listen to that part of that tape.

And when you listen to that tape you're going to see [ ] Elkshoulder has a lot of time to insert his own defense there, he's talking about what he did, what he did, what he did. It's almost like a setup, almost like a setup. But [ ] Walton says yeah, but the honking of the horn and then you and I got out. That means ... [Elkshoulder] was in there, was in there. By [ ] Walton's own admission of himself being involved, he involves [ ] Elkshoulder as well.

So if [CW] was mistaken, the bottom line is so what? If he's mistaken, then it was [Walton] that stabbed him and it was [Elkshoulder] who held him down. Either way they're both guilty either as the person who actually stabbed him or an accomplice.

Elkshoulder argued that Walton was the person who stabbed CW, and that the "sudden and unexpected attack was ... a surprise to [ ] Elkshoulder, who was an unwit-

ting, accidental spectator and witness to this incident." Elkshoulder argued that Walton's recorded statement that he stabbed CW "about two to three times . . . explains all the injuries that you see here that was suffered by [CW]." Elkshoulder also argued that CW's recollection of certain details the day of the incident—such as which passenger directed him where to drive—was inconsistent.

Walton argued that Elkshoulder's testimony was not credible, and that he "wasn't being straightforward and honest with [the jury] when he attempts to blame [ ] Walton for doing all of the bad things that happened later on." Walton noted CW's testimony that the "Asian male" stabbed him, and that he never saw "the Caucasian male" with the knife. Walton further argued that:

> there is absolutely no question that [CW] has been consistent throughout all of his testimony and his—and his contact with the police and with the court that it was not [ ] Walton that did anything. [ ] Walton didn't have a knife, he was seated in the back seat when [CW] was first stabbed, and that it was the guy, the fat guy, the big guy, the Asian guy, the guy who he struggled with with the knife, [ ] Elkshoulder, who stabbed him.

Walton also argued that the recording "in which [Walton] is claimed to have stated that he stabbed [CW]" was not credible:

> . . . First of all, who provided the tape recorder? . . . It wasn't . . . [the DPD]. The testimony was that he didn't have a hand in actually setting up the conversation and taping it. Did Detective Ogawa, the police investigator who was responsible for being the lead investigator in this case, did he have a copy of the tape recording so that he could conduct a police investigation about it? Well, you heard the detective testify right here before you that he had been told about the recording but never got a copy. Never had a chance to duly take a look at it, examine it forensically or do whatever, never got a copy.

> Well, during the trial did [ ] Rodrigues or [ ] Laumauna testify under oath subject to cross-examination that they listened to the recording and identified [ ] Elkshoulder and [ ] Walton on the recording? Was there any testimony like that? No, there wasn't, there was no such testimony. Did

the prosecutor present the recording as part of its case? Did [the State] say hey, we have this recording, we want you to listen to it? No, he did not.

> So what is the state of the evidence about the recording? The only person vouching for it as being—as something that accurately and truly reflects what it purports to be, by testimony here by the evidence that is before you, ladies and gentlemen of the jury, is [ ] Elkshoulder. And you heard about how you judge credibility and [the State] went through a whole list, including bias, motive, whatever.

> Now, we would submit . . . that [ ] Elkshoulder and his tape recording and his claim that it's truthful and accurate, is not worthy of your belief. It's not worthy of any type of credibility.

> . . . .

> . . . Was there some type of manipulation going on with the recording? We certainly don't know but . . . we would submit that given the type of circumstances in which the recording was presented, that it lacks credibility and it's not worthy of your belief.

In rebuttal, the State argued that although the recording—which the State characterized as "suspect"—would indicate that Walton was guilty, "that's not how the State believes [ ] Walton is guilty."

> [The] State believes [ ] Walton is guilty by the very words the way [CW] told you what happened, that upon [CW] being stabbed, he was pulled down by two of the men and that the knife over him, he struggled with as a third attempt was made to stab him. Whichever of the two it may have been, [CW] believes it was probably still [ ] Elkshoulder. But, regardless, the two of them worked in concert together, they were both participants. It wasn't one was a witness and one did everything else, they worked together.

> . . . .

> With respect to this tape, you know, well, it is what it is. But we're not asking you to convict [ ] Walton for attempted murder based on that tape. That tape was full of deception. We don't know what [ ] Elkshoulder did, but we know he's a lead-

er, we know Walton is a follower, kind of clueless. We don't know everything about what happened with that tape but that tape just reeks with suspicion.

If it was anymore substantial and believable, the State would have presented it in its case-in-chief but it is not worthy of belief. Exactly what [Walton's counsel] said, it is not worthy of belief. But [CW] is worthy of belief and it is on that evidence that we ask you to find the defendants, both of them, guilty for both charges.

### 7. Verdict and sentencing

The jury found Walton guilty as charged on both counts. In contrast, the jury found Elkshoulder guilty of Assault in the First Degree and Robbery in the First Degree. Pursuant to a special interrogatory, the jury found a merger of Walton's offenses. On August 10, 2011, the circuit court entered its Judgment of Conviction and Sentence, convicting Walton of Attempted Murder in the Second Degree and Robbery in the First Degree. The judgment dismissed the Robbery charge without prejudice, and sentenced Walton to a life term of incarceration with the possibility of parole for Attempted Murder in the Second Degree.

### E. ICA Appeal

In his opening brief to the ICA, Walton asserted six points of error. First, Walton argued that the circuit court erred in denying his motion for severance, stating that Elkshoulder's and his defenses were in irreconcilable conflict with each other because Elkshoulder sought to blame Walton for the stabbing. Second, Walton argued that the circuit court erred in denying his motion to suppress the identifications made by Koki and Rodrigues, and the information obtained using the GNC card. Third, Walton argued that the circuit court erred in admitting certain photographs.[13] Fourth, Walton argued that the circuit court erred when it admitted the recorded phone conversation because it was not properly authenticated, was improper hearsay, and he was denied his right to confront Elkshoulder and the DPD about

their conversations regarding the recording. Fifth, Walton argued that the jury instructions regarding the charged offense and lesser included offenses "resulted in prejudicially insufficient, erroneous, inconsistent, or misleading instructions." Finally, Walton argued that the State's evidence was "defective" and that the circuit court thus erred in denying his motion for a judgment of acquittal at the conclusion of the State's case.

In its Memorandum Opinion, the ICA rejected all of Walton's claims and affirmed the circuit court's August 10, 2011 judgment. First, the ICA held that the circuit court did not abuse its discretion in denying Walton's motions for severance. The ICA explained that although Walton's and Elkshoulder's defenses "conflicted to an extent," Walton failed to demonstrate that the conflict alone led the jury to infer his guilt. The ICA further explained that Walton failed to demonstrate that evidence damaging to his case in the joint trial would not have been admissible in a separate trial. Second, the ICA held that the photographic line-up was not impermissibly suggestive, and that Walton did not have a reasonable expectation of privacy in GNC's business records. Third, the ICA held that the recorded telephone conversation was properly authenticated and admitted as a statement against interest. Fourth, the ICA held that the circuit court properly instructed the jury. Finally, the ICA held that substantial evidence supported Walton's conviction.[14]

## II. Standards of Review

### A. Severance of Defendants

This court reviews the denial of a motion for severance for an abuse of discretion. *State v. Matias*, 57 Haw. 96, 98, 550 P.2d 900, 902 (1976); *State v. Timas*, 82 Hawai'i 499, 512, 923 P.2d 916, 929 (App. 1996). In deciding a motion for severance, the trial court must "balance possible prejudice to the defendant from joinder with the public interest in efficient use of judicial time through joint trial of defendants and offenses which are connected." *Matias*, 57 Haw. at

---

13. Walton does not argue this point in his application to this court.

14. The ICA also held that the circuit court properly admitted photographs of CW's injury. Again, Walton does not raise that issue here.

98, 550 P.2d at 902. An appellate court "may not conclude that the defendant suffered prejudice from a joint trial unless it first concludes that a defendant was denied a fair trial. What might have happened had the motion for severance been granted is irrelevant speculation." *Timas*, 82 Hawai'i at 512, 923 P.2d at 929 (brackets and ellipsis omitted) (quoting *State v. Gaspar*, 8 Haw.App. 317, 327, 801 P.2d 30, 35 (App.1990)).

### B. Motion to Suppress Evidence and Identification Testimony

 This court reviews a trial court's ruling on a motion to suppress evidence de novo:

> to determine whether the ruling was "right" or "wrong." The proponent of the motion to suppress has the burden of establishing, by a preponderance of the evidence, that the statements or items sought to be excluded were unlawfully secured and that his or her right to be free from unreasonable searches or seizures was violated under the fourth amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution.

*State v. Spillner*, 116 Hawai'i 351, 357, 173 P.3d 498, 504 (2007) (citations omitted).

> When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pretrial identification procedure, he or she has the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, and the elapsed time, the witness's identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury.

*State v. Araki*, 82 Hawai'i 474, 484, 923 P.2d 891, 901 (1996) (quoting *State v. Okumura*, 78 Hawai'i 383, 391, 894 P.2d 80, 88 (1995)).

### C. Jury Instructions

 It is the circuit court's duty and ultimate responsibility to ensure that the jury was properly instructed on issues of criminal liability. *State v. Kikuta*, 125 Hawai'i 78, 90, 253 P.3d 639, 651 (2011). "When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial." *Kobashigawa v. Silva*, 129 Hawai'i 313, 320, 300 P.3d 579, 586 (2013).

### D. Motion for Judgment of Acquittal/Sufficiency of Evidence

 The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt.

*State v. Keawe*, 107 Hawai'i 1, 4, 108 P.3d 304, 307 (2005). This court employs the same standard of review in reviewing a motion for a judgment of acquittal. *Id.*

### III. Discussion
### PART I: OPINION OF THE COURT BY RECKTENWALD, C.J.

We hold that the circuit court erred in denying Walton's motion for severance because Walton's and Elkshoulder's irreconcilable defenses, combined with the admission of the recorded telephone conversation, denied Walton his right to a fair trial. Although our resolution of the severance issue is dispositive of this appeal, we nevertheless address Walton's arguments concerning the suppression of evidence and jury instructions, because those issues may arise again on remand in Walton's separate trial. *See, e.g., State v. Solomon*, 107 Hawai'i 117, 120, 111 P.3d 12, 15 (2005) (addressing points of error "in order to provide guidance to the [trial court] on remand"). Finally, we consider Walton's argument that the circuit court erred in denying his motion for a judgment of acquittal, because the double jeopardy clauses of the United States Constitution and Hawai'i Constitution would prohibit Walton's retrial if the State had failed to adduce

sufficient evidence for a jury to find guilt beyond a reasonable doubt. *See, e.g., State v. Kalaola,* 124 Hawai'i 43, 52, 237 P.3d 1109, 1118 (2010).

## A. The circuit court erred in denying Walton's motion for severance

Walton argues that the circuit court erred in denying his motion for severance because his and Elkshoulder's defenses were "inconsistent, antagonistic, and irreconcilable," and because he was "substantially prejudiced" by evidence admitted at trial. Specifically, Walton argues that he suffered prejudice because Elkshoulder was allowed to introduce the recorded telephone conversation in which Walton admitted that he had stabbed CW.

As set forth below, the circuit court abused its discretion in denying Walton's motion for severance. Under the circumstances of this case, Walton was denied a fair trial where he and Elkshoulder not only had irreconcilable defenses, but Elkshoulder offered a recording containing Walton's admission that he stabbed CW. Walton therefore had to defend against evidence supporting two different theories of his guilt, one advanced by the State and one by his co-defendant.

Hawai'i Rules of Penal Procedure (HRPP) Rule 8(b) (2011), permits joinder of two or more defendants in the same charge:

(1) when each of the defendants is charged with accountability for each offense included in the charge;

(2) when each of the defendants is charged with conspiracy and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or

(3) when, even if conspiracy is not charged and all of the defendants are not charged in each count, the several offenses charged:

(i) were part of a common scheme or plan; or

(ii) were so closely connected in respect to time, place and occasion that it would be difficult to separate proof of one charge from proof of the others.

However, "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in a charge or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires." HRPP Rule 14.

In deciding a motion for severance, the trial court must "balance the possible prejudice to the defendant from joinder with the public interest in efficient use of judicial time through joint trial of defendants and offenses which are connected." *State v. Matias,* 57 Haw. 96, 98, 550 P.2d 900, 902 (1976). An appellate court "may not conclude that the defendant suffered prejudice from a joint trial unless it first concludes that a defendant was denied a fair trial." *Timas,* 82 Hawai'i at 511, 923 P.2d at 929 (ellipsis and brackets omitted) (quoting *State v. Gaspar,* 8 Haw. App. 317, 327, 801 P.2d 30, 35 (1990)).

 The defendant bears the burden of proving a denial of a fair trial. *Timas,* 82 Hawai'i at 512, 923 P.2d at 928. A joint trial may be unfair to one defendant when: (1) the core of each defense is in irreconcilable conflict with the other, (2) the defendant in question is prevented from introducing evidence that would have been admissible in that defendant's separate trial not involving other defendants, or (3) evidence damaging to the defendant in question is admitted and it would not have been admissible in that defendant's separate trial not involving other defendants. *Gaspar,* 8 Haw.App. at 327, 801 P.2d at 35; *see also Timas,* 82 Hawai'i at 511, 923 P.2d at 928. As the United States Supreme Court has observed, however, there is no test or exclusive list of prejudices because "[t]he risk of prejudice will vary with the facts in each case." *Zafiro v. United States,* 506 U.S. 534, 539, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993).

 It is well settled that defendants are not entitled to severance merely because their defenses are inconsistent or they may have a better chance of acquittal in separate trials. *Id.* at 540, 113 S.Ct. 933. As the Ninth Circuit has explained,

Mere inconsistency in defense positions is insufficient to find codefendants' defenses antagonistic. Inconsistency, alone, seldom produces the type of prejudice that warrants reversal. The probability of revers-

ible prejudice increases as the defenses move beyond the merely inconsistent to the antagonistic.

Mutually exclusive defenses are said to exist when acquittal of one codefendant would necessarily call for the conviction of the other. The prototypical example is a trial in which each of two defendants claims innocence, seeking to prove instead that the other committed the crime.

*United States v. Tootick*, 952 F.2d 1078, 1081 (9th Cir.1991) (internal citations and quotation marks omitted); *United States v. Throckmorton*, 87 F.3d 1069, 1072 (9th Cir. 1996) ("Antagonism between defenses or the desire of one defendant to exculpate himself by inculpating a codefendant ... is insufficient to require severance.").

■■■■■ Although the joinder of trials in which defendants maintain mutually exclusive defenses produces heightened dangers of prejudice, there is no per se rule against joinder in such cases. *Tootick*, 952 F.2d at 1083; *Zafiro*, 506 U.S. at 538, 113 S.Ct. 933 ("Mutually antagonistic defenses are not prejudicial per se."). Rather, "in order to establish an abuse of discretion, the defendant[ ] must demonstrate that clear and manifest prejudice did occur." *Tootick*, 952 F.2d at 1083.

For example, in *State v. Mabuti*, 72 Haw. 106, 807 P.2d 1264 (1991), two co-defendants were jointly tried and both were convicted of murder in the beating death of a teenager. 72 Haw. at 109, 807 P.2d at 1266. One of the

defendants, Joefrey Mabuti, testified that he was not involved in the beating, and the other defendant, Vicente Acosta, testified that he tried to stop the beating, and that he saw Mabuti participate in the beating. *Id.* at 109–10, 807 P.2d at 1267.

Before Mabuti and Acosta's joint trial, another individual, Enrique Pintoy, confessed to his own participation in the beating, and stated that Mabuti had participated in the beating. *Id.* at 110, 807 P.2d at 1267. Acosta sought to have Pintoy's confession admitted, as a statement against interest, arguing that it was exculpatory as to himself. *Id.* Mabuti, however, objected, because Pintoy's confession was damaging to his case. *Id.* After the parties redacted Pintoy's statement, what was left "was of little consequence," and Acosta chose not to use it at trial. *Id.*

Based, in part, on Pintoy's confession, Acosta made several attempts to have the trial severed. *Id.* at 111, 807 P.2d at 1267. After Acosta's initial motion was denied by a motions judge, the trial judge twice stated that the case should have been severed, but nevertheless denied Acosta's motions because he felt bound by the earlier ruling of the motions judge.[15] *Id.* at 110, 807 P.2d at 1267. On appeal, Mabuti and Acosta each argued that their trials should have been severed. *Id.* at 113, 807 P.2d at 1268.

This court concluded that the trial court abused its discretion in denying Acosta's mo-

---

**15.** In the instant case, Judge Town originally consolidated the trial, and Judge Garibaldi was subsequently asked to sever. In denying Walton's March 23, 2011 motion for severance, Judge Garibaldi noted that she was "not inclined to alter the decision that was made by [Judge Town]." Specifically, Judge Garibaldi explained that "[u]nless there are cogent reasons to support a second court's action, any modification of a prior ruling of another court of equal and concurrent jurisdiction is deemed—could be deemed an abuse of discretion." In denying Elkshoulder's May 12, 2011 motion for severance—to which Walton joined—Judge Garibaldi explained that she was "torn at this point" and "not quite certain," and that it was "a very close issue." Judge Garibaldi nevertheless concluded that she was not "inclined to set aside [the court's] prior order denying the motion to sever the trial."

As this case makes clear, it is "very difficult for the trial judge to make a finding on the prejudice issue before trial, as it involves speculation about

many things which may or may not occur." *Matias*, 57 Haw. at 98, 550 P.2d at 902 (quotation marks and citation omitted). Here, for example, prior to trial it was impossible for the circuit court to know for certain whether Elkshoulder would testify, and, consequently, whether the recorded conversation would be offered as evidence. Because of this difficulty in determining prejudice prior to trial, a pretrial motion for severance must also be renewed during trial or else any claim of error will be considered waived. *State v. Balanza*, 93 Hawai'i 279, 288, 1 P.3d 281, 290 (2000); *State v. Hilongo*, 64 Haw. 577, 578, 645 P.2d 314, 316 (1982) ("failure to renew the motion to sever under [HRPP Rule 14] during the course of the trial waived any claimed error"). Thus, in evaluating each successive motion for severance, the trial court must consider anew whether "it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in a charge or by such joinder for trial together." HRPP Rule 14.

tion for severance because he was prejudiced by not being able to present his exculpatory evidence, i.e., the unredacted statement of Pintoy. *Id.* at 114, 807 P.2d at 1269. However, this court rejected Mabuti's argument that the trial should have been severed. The court concluded that Mabuti's and Acosta's defenses were not sufficiently antagonistic because "any combination of guilty or not guilty verdicts, as to either or both of these defendants, would have withstood any complaint of inconsistent verdicts." *Id.* at 113, 807 P.2d at 1268. The court further noted that Mabuti was allowed to present all of his evidence. *Id.* at 113–14, 807 P.2d at 1269.

In *Tootick*, three individuals—Moses Tootick, Charles Frank, and Aaron Hart—drove to a secluded hill, where Hart was stabbed. Hart testified that Frank stabbed him. *Id.* at 1080. Frank testified that Tootick stabbed Hart. *Id.* at 1081. Tootick did not testify, but his lawyer claimed that Tootick was highly intoxicated and was either passed out or was asleep during the entire episode. *Id.* The Ninth Circuit explained that "[b]ecause only Frank and Tootick were present when Hart was attacked, and because there was no suggestion that Hart injured himself, the jury could not acquit Tootick without disbelieving Frank. Each defense theory contradicted the other in such a way that the acquittal of one necessitates the conviction of the other." *Id.* The Ninth Circuit held, therefore, that Tootick's and Frank's defenses were irreconcilable. *Id.*

Like in *Tootick*, Walton's and Elkshoulder's defenses were irreconcilable. Elkshoulder testified that Walton jumped on CW and that he immediately got out of the taxi and started walking away. In short, Elkshoulder argued that he was not in the taxi when CW was stabbed. Walton, however, also argued that he did not stab CW. In this regard, during his cross-examination of CW, Walton elicited testimony confirming that it was Elkshoulder who had initially grabbed and stabbed CW. Walton further elicited testimony that CW never saw him holding a knife. Walton's and Elkshoulder's defenses were therefore irreconcilable because they each maintained that the other person stabbed CW. *See Tootick*, 952 F.2d at 1081.

■ As stated above, there is no per se rule against joinder in trials in which defen-dants maintain mutually exclusive defenses. *Tootick*, 952 F.2d at 1083; *Zafiro*, 506 U.S. at 538, 113 S.Ct. 933. Here, however, the admission of the recording—in conjunction with Walton and Elkshoulder's irreconcilable defenses—deprived Walton of a fair trial. Courts have recognized that "the primary danger that [the rule requiring severance based on irreconcilable defenses] seeks to avoid is a defendant faced with two prosecutors—the state and his co-defendant." *United States v. Sherlock*, 962 F.2d 1349, 1363 (9th Cir.1989); *United States v. Lee*, 744 F.2d 1124, 1126 (5th Cir.1984). "The rule is also designed to prevent a situation in which each defendant is the government's best witness against the other." *Lee*, 744 F.2d at 1126. Here, Walton was in effect forced to face two prosecutors, the State and Elkshoulder, each of which offered different evidence supporting conflicting theories of his culpability.

On the recording, Walton admitted to stabbing CW "2–3 times." Elkshoulder relied on the recording to argue that Walton had stabbed CW. In contrast, the State asserted that "it was not Walton who stabbed ... [CW], it was Elkshoulder who stabbed him," while Walton helped to hold CW down.

Because the recording was inconsistent with the State's theory of the case, the State contended that it was "scripted" and "rehearsed." The State repeated its position during its closing argument, arguing that "the tape was rehearsed," specifically noting that the circumstances under which the recording was made were "highly suspect." And, during its rebuttal argument, the State argued that the "tape just reeks with suspicion," noting that "[i]f it was anymore substantial and believable, the State would have presented it in its case in chief but it is not worthy of belief." Nevertheless, during its closing argument, the State argued that the jury could still find Walton guilty even if the jury found the tape credible. In effect, the State was able to rely on its primary theory (i.e., that Walton held CW down), while simultaneously suggesting that the jury could accept Elkshoulder's theory (i.e., that Walton wielded the knife). Similarly, Walton had to defend against both theories.

As it turned out, Elkshoulder's recording appears to have been persuasive evidence against Walton. Despite the State's theory of the case, and CW's testimony in support of that theory, the jury—after hearing Walton's admission on the recording—convicted Walton of attempted murder, but convicted Elkshoulder only of assault in the first degree. It is clear, therefore, that Elkshoulder's offering of a recording in which Walton confessed to stabbing CW, where the State challenged the veracity of the recording, and where Walton's apparent confession was inconsistent with the State's theory of the case, prejudiced Walton and denied him a fair trial.

Courts of this State have stated that "speculation about what might have happened had a motion for severance been granted is irrelevant," and that the "only relevant facts are what actually happened." *Gaspar*, 8 Haw. App. at 328, 801 P.2d at 36 (rejecting defendant's argument that he did not testify because his testimony would have implicated his co-defendant, who would have retaliated by testifying and incriminating defendant); *State v. White*, 5 Haw.App. 670, 672, 706 P.2d 1331, 1333 (1985) (finding that trial court did not abuse its discretion in denying defendant's motion for severance where defendant was not prevented from presenting his evidence, and no damaging evidence was introduced in the joint trial that would not have been admissible in defendant's separate trial). In this case "what actually happened" prejudiced Walton because the admission of the recording unfairly forced Walton to, in effect, confront two prosecutors.

Moreover, it appears that, had Walton's trial been severed, the recording would not have been offered by the State in his separate trial. It was Elkshoulder who authenticated the tape through his own testimony. As stated above, the State attacked the recording as "rehearsed," "scripted," "highly suspect," "reek[ing] with suspicion," and "not worthy of belief." Any argument by the State that it would have offered the recording in Walton's separate trial, therefore, would appear to be inconsistent with that position. Moreover, absent the testimony of Elkshoulder, it is unclear how the State would have been able to authenticate the recording.

Accordingly, on the facts of this case, Walton was denied a fair trial. The circuit court therefore abused its discretion in denying Walton's motion for severance.

**B. The circuit court correctly denied Walton's motion to suppress identification evidence**

 Walton also challenges the admissibility of identification evidence from two of his co-workers, Koki and Rodrigues. Specifically, Walton argues that the "circumstances leading up to the photographic line-up, including repeated prior viewings, and prior comments and opinions from others, resulted in bolstering and tainting the subsequent photo line-up procedure as well as the in-court trial identifications."

At trial, Rodrigues testified that he identified Walton in the surveillance photos. Although Koki did not testify at trial, Detective Ogawa testified that Koki identified the men in the surveillance photos as Walton and Elkshoulder, and that Koki also identified Walton and Elkshoulder in photo lineups. Laumauna also testified at trial that the men in the surveillance photos were Walton and Elkshoulder. Although Walton sought to suppress the identification evidence from Rodrigues and Koki, he never sought to suppress Laumauna's testimony. Given Laumauna's identification of Walton and Elkshoulder, it is therefore unclear what prejudice, if any, Walton suffered as a result of Rodrigues's and Koki's identifications. Nevertheless, for the reasons set forth below, we conclude that the circuit court did not err in denying Walton's motion to suppress the identification evidence.

 In general, "[a] conviction based on eyewitness identification at trial will be set aside if a pretrial identification by photographic display was conducted in a manner impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *State v. Malani*, 59 Haw. 167, 170, 578 P.2d 236, 238 (1978). Specifically,

When the defendant challenges admissibility of eyewitness identification on the grounds of impermissibly suggestive pretrial identification procedure, he or she has

the burden of proof, and the court, trial or appellate, is faced with two questions: (1) whether the procedure was impermissibly or unnecessarily suggestive; and (2) if so, whether, upon viewing the totality of the circumstances, such as opportunity to view at the time of the crime, the degree of attention, the accuracy of prior description, the level of certainty, and the elapsed time, the witness' identification is deemed sufficiently reliable so that it is worthy of presentation to and consideration by the jury. *State v. DeCenso*, 5 Haw.App. 127, 131, 681 P.2d 573, 577–78 (1984).

As a preliminary matter, we note that this case does not raise many of the concerns usually associated with eyewitness identifications because Koki and Rodrigues did not witness the incident, and neither of them identified Walton as participating in the criminal conduct at issue in this case. *See, e.g., State v. Cabagbag*, 127 Hawai'i 302, 310–11, 277 P.3d 1027, 1035–36 (2012) (discussing recent studies on the reliability of eyewitness identifications). Instead, Rodrigues and Koki merely confirmed the identity of Elkshoulder and Walton in surveillance camera photos and photo line-ups, based on their familiarity with Walton and Elkshoulder from work. In any event, the identification process used in this case was not improper.

As stated above, at Walton's motion to suppress hearing, Rodrigues testified that he went to an online news website to view photos of two men "accused of a crime" after his supervisor called him and told him "to check out the news." Rodrigues stated that the photos were "kind of blurry but ... there's certain things that you can pick out." Rodrigues stated that he looked at the photos on the website "[a]bout 20 times" and consulted with his family, who had met Elkshoulder. Rodrigues testified that, although the photos on the website were "kind of hard," "once I seen [the photos] on the news I knew definitely" that the photos depicted Walton and Elkshoulder. Rodrigues explained that he was able to identify Walton by "[h]is stature, the way he—just the overall appearance, the style of his hair, the glasses, the backpack, just that kind of things in nature." Rodrigues further explained that he had been supervising Walton at work for about five months, and that he had been supervising Elkshoulder for about seven months. Rodrigues stated that a day or two later, police contacted him and showed him the same surveillance photo, and that, about a month later, he was contacted by police to view a photographic lineup, from which he identified Walton.

Koki similarly testified that he received a phone call from someone who told him to look at a surveillance photo in an online news report. The person told Koki, "I think it's one of your guys" but did not mention any names. Koki stated that he looked at the photo online about ten times over ten minutes, after which he called his manager and stated, "I believe this is [Elkshoulder] and [Walton]." Koki explained that he concluded on his own that it was Elkshoulder and Walton in the photo. Koki noted that he identified Elkshoulder in the photo by his clothing and hair, and identified Walton by his hair and the backpack. Koki stated that almost a month later, he identified Walton and Elkshoulder from a lineup of photos.

In other words, Rodrigues and Koki each identified Walton and Elkshoulder as the men depicted in the surveillance photograph before they had been contacted by the police. Based on their regular contact with Elkshoulder and Walton, Rodrigues, and Koki were able to identify them as the individuals depicted in the news segment and the photo line-up. The circuit court correctly concluded, therefore, that Koki and Rodrigues identified Walton and Elkshoulder independently as a result of their familiarity with them.

Moreover, the photographic line-up was not impermissibly suggestive. Detective Michael Ogawa testified that he put together a photographic lineup using photos from Hawai'i driver's licenses and state IDs, and showed them to Rodrigues and Koki. Detective Ogawa also stated that he showed Rodrigues and Koki photographs taken from the surveillance video. The images included in the photo line-up are not suggestive, and the record does not indicate that the photo line-up was otherwise conducted in an impermissibly suggestive manner. In this regard, the police first showed Rodrigues and Koki the surveillance photo and then showed them the photo line-up. Rodrigues and Koki then

each identified Walton as a person with whom they had worked. The circuit court correctly concluded, therefore, that the photo line-up was not impermissibly suggestive. Finally, even assuming that the photo line-up was impermissibly suggestive, under the totality of the circumstances, Rodrigues's and Koki's identifications of Walton were sufficiently reliable because of their familiarity with Walton and Elkshoulder from work. *See DeCenso*, 5 Haw.App. at 131, 681 P.2d at 577–78. For the foregoing reasons, the circuit court correctly denied Walton's motion to suppress.

## C. The circuit court properly instructed the jury

■■ Walton argues that the circuit court erred in instructing the jury because the instructions failed to distinguish between liability as a principal and liability as an accomplice. Specifically, Walton asserts that "the words 'as a principal' should [have been] included in all substantive offense instructions, and the instruction that the accomplice must have the specific intent or conscious object to commit the underlying crime." Walton argues, therefore, that the instructions were "prejudicially insufficient, erroneous, inconsistent, or misleading."

It is the circuit court's duty and ultimate responsibility to ensure that the jury was properly instructed on issues of criminal liability. *State v. Kikuta*, 125 Hawai'i 78, 90, 253 P.3d 639, 651 (2011).

> When jury instructions, or the omission thereof, are at issue on appeal, the standard of review is whether, when read and considered as a whole, the instructions given are prejudicially insufficient, erroneous, inconsistent, or misleading. Erroneous instructions are presumptively harmful and are a ground for reversal unless it affirmatively appears from the record as a whole that the error was not prejudicial.

*Kobashigawa v. Silva*, 129 Hawai'i 313, 320, 300 P.3d 579, 586 (2013).

Under Hawai'i law, a person is "guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both." HRS § 702–221(1). A person is "legally accountable" for the conduct of another person when:

(a) Acting with the state of mind that is sufficient for the commission of the offense, he causes an innocent or irresponsible person to engage in such conduct; or

(b) He is made accountable for the conduct of such other person by this Code or by the law defining the offense; or

(c) He is an accomplice of such other person in the commission of the offense.

HRS § 702–221(2).

A person is an accomplice of another person in the commission of an offense if:

(1) With the intention of promoting or facilitating the commission of the offense, the person:

(a) Solicits the other person to commit it; or

(b) <u>Aids or agrees or attempts to aid the other person in planning or committing it;</u> or

(c) Having a legal duty to prevent the commission of the offense, fails to make reasonable effort so to do; or

(2) The person's conduct is expressly declared by law to establish the person's complicity.

HRS § 702–222 (emphasis added).

Here, the circuit court instructed the jury with respect to accomplice liability as follows:

> A defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense. The prosecution must prove accomplice liability beyond a reasonable doubt.
>
> A person is an accomplice of another in the commission of an offense if:
>
> 1. With the intent to promote or facilitate the commission of the offense he
>
> a. solicits the other person to commit it; or
>
> b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.
>
> Mere presence at the scene ... of an offense or knowledge that an offense is being committed, without more, does not make a person an accomplice to the offense. However, if a person plans or participates in the commission of an offense

with the intent to promote or facilitate the offense, he is an accomplice to the commission of the offense.

A person is not guilty of an offense unless the State proves beyond a reasonable doubt that the person acted with the required states of mind, as these instructions specify, with respect to each element of the offense. The instruction for the offense charged specifies the states of mind required to be proved.

The circuit court also instructed the jury on the charged offenses, the lesser included offenses, and the states of mind associated with each of those offenses. Accordingly, the circuit court's instructions to the jury accurately represented the relevant law.

Nevertheless, Walton argues that the words " 'as a principal' should [have been] included in all substantive offense instructions." That argument is unfounded. As the commentary on HRS § 702–221(1) states, "[d]istinctions between principals and accessories are dispensed with and a defendant may be convicted directly of an offense committed by another for whose conduct the defendant is accountable." *See State v. Fukusaku*, 85 Hawai'i 462, 489, 946 P.2d 32, 59 (1997) (same).

Walton's argument that the circuit court should have instructed the jury that "the accomplice must have the specific intent or conscious object to commit the underlying crime" is similarly without merit, since the circuit court's instructions accurately stated the relevant law. The circuit court instructed the jury that "[a] defendant charged with committing an offense may be guilty because he is an accomplice of another person in the commission of the offense." *See* HRS § 702–221(1) ("A person is guilty of an offense if it is committed by his own conduct or by the conduct of another person for which he is legally accountable, or both."); HRS § 702–221(2) ("A person is legally accountable for the conduct of another person when . . . he is an accomplice of such other person in the commission of the offense."). The circuit court further instructed the jury that:

A person is an accomplice of another in the commission of an offense if:

1. With the intent to promote or facilitate the commission of the offense he

a. solicits the other person to commit it; or

b. aids or agrees or attempts to aid the other person in the planning or commission of the offense.

This instruction accurately states the law under HRS § 702–222. No further instruction, therefore, was required, and the ICA correctly concluded that the circuit court's instructions were not erroneous, misleading, or prejudicially insufficient.

**D. The circuit court correctly denied Walton's motion for judgment of acquittal since substantial evidence supported Walton's conviction**

 Finally, Walton argues that the circuit court erred in denying his motion for judgment of acquittal, and that the evidence was insufficient to support his conviction. Walton's arguments in this regard are meritless.

"The standard to be applied by the trial court in ruling upon a motion for a judgment of acquittal is whether, upon the evidence viewed in the light most favorable to the prosecution and in full recognition of the province of the [trier of fact], a reasonable mind might fairly conclude guilt beyond a reasonable doubt." *Keawe*, 107 Hawai'i at 4, 108 P.3d at 307. This court employs the same standard of review in reviewing a motion for a judgment of acquittal. *Id.*

 In reviewing the sufficiency of the evidence supporting a conviction on appeal, the evidence adduced at trial must be considered in the strongest light for the prosecution. *State v. Bailey*, 126 Hawai'i 383, 398, 271 P.3d 1142, 1157 (2012). "The test on appeal is not whether guilt is established beyond a reasonable doubt, but whether there was substantial evidence to support the conclusion of the trier of fact." *Id.* at 399, 271 P.3d at 1158 (citation omitted). " 'Substantial evidence' as to every material element of the offense charged is credible evidence which is of sufficient quality and probative value to enable a person of reasonable caution to support a conclusion." *Id.* (quotation marks and citation omitted).

Based on the statutory elements of the offense of attempted murder in the second degree, the State was required to establish beyond a reasonable doubt that Walton intentionally engaged in conduct which, under the circumstances as Walton believed them to be, constituted a substantial step in a course of conduct intended or known by Walton to cause the death of CW. *See* HRS §§ 705–500 and 707–701.5; *State v. Kekona*, 120 Hawai'i 420, 443, 209 P.3d 1234, 1257 (App.2009).

At trial, CW testified that, after his neck was initially cut, Walton and Elkshoulder pinned him down. CW further testified that, as the two men were holding him down, he saw a hand holding a knife start stabbing him.

CW also identified the two men depicted in the surveillance photos as the men he had picked up and who later attacked him. Detective Ogawa similarly testified that CW had identified the two men depicted in the photograph as the two men that had attacked him. And Rodrigues and Laumauna each identified the men in the photograph as Elkshoulder and Walton.

Finally, Dr. Yost testified that CW suffered two stab wounds to his neck, lacerations on his right forearm and left hand, and a puncture wound on his right hand. Dr. Yost further testified that one of CW's wounds could have caused death if it had gone untreated.

Viewing this evidence in the light most favorable to the State, a reasonable mind might fairly conclude Walton's guilt beyond a reasonable doubt. The aforementioned testimony placed Walton in CW's taxi, and, at the very least, supports the conclusion that Walton held CW down while he was stabbed. The circuit court, therefore, correctly denied Walton's motion for judgment of acquittal, and Walton's conviction was supported by substantial evidence.

16. Article 1, section 7 of the Hawai'i Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of

## IV. Conclusion

For the foregoing reasons, we vacate the ICA's June 21, 2013 judgment, and the circuit court's August 10, 2011 judgment of conviction and sentence, and remand this case to the circuit court for a new trial.

PART II: MOTION TO SUPPRESS, OPINION OF THE COURT BY ACOBA, J., WITH WHOM McKENNA AND POLLACK, J., JOIN

Article 1, section 7 of the Hawai'i Constitution [16] protects all information in which individuals have a legitimate expectation of privacy. Accordingly, the bare assertion that information was disclosed to a third party does not place such information outside the parameters of article 1, section 7. Rather, the protection afforded to information disclosed to a third party must be determined by examining whether an individual reasonably expected such information to remain private as to others and whether society would view such expectation as reasonable. Thus, we must respectfully disagree with the holding of the Intermediate Court of Appeals (ICA) that article 1, section 7 "does not apply to basic information revealed to a third party, 'even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.'" *State v. Walton*, No. CAAP–11–0000667, 129 Hawai'i 450, 2013 WL 2190159, at *5 (App. May 21, 2013) (mem.) (quoting *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976)). This rule is untenable in a technological age where in the ordinary course of life, individuals will of necessity have disclosed a boundless amount of information to third parties.

### I.

### A.

The search in the instant case involves a General Nutrition Corporation (GNC) membership card located in a backpack found at the scene of the crime. To recount briefly,

privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

after stabbing the complaining witness (CW), the assailants fled from the scene, leaving behind a backpack. Prior to searching the backpack, police obtained a warrant to search the backpack and any or all closed containers within the backpack for "[a]rticles of personal property tending to establish the identity of the person in control" of the backpack:

**You Are Commanded to Search:**

A. A black and blue, nylon backpack ... which was recovered by Honolulu Police Department ... officers at 3291 Pinaoula Street....

B. Any and all closed containers located within Item A, as described above, capable of concealing the whereabouts of the below mentioned property:

**For the following property:**

Any and all evidence pertaining to a Robbery in the First Degree ... including, but not limited to:

1. Unknown denominations of United States paper currencies taken in the aforementioned Robbery in the First Degree case;

2. One (1) unknown make knife, with an unknown blade length, and grip;

3. Articles of personal property, tending to establish the identity of [the] person in control of said backpack and property, including, but not limited to: personal identification, bills, bank account statements, checks, photographs, receipts, agreements, letters, lists, notes, personal telephone lists, photographs, books, and other information and documents tending to establish ownership of said backpack, and/or property[.]

[RA, Dkt. 4:106] (Emphasis added.) Inside the backpack, the police found the GNC card containing a membership number but no other identifying information. Police officers contacted GNC to obtain the name [17] associated with the number on the membership card. GNC informed police that the card belonged to Petitioner/Defendant–Appellant John Walton (Walton).[18]

**B.**

Before trial, Walton filed a motion to suppress, *inter alia*, the information recovered from GNC regarding the identity of the card's owner. Walton maintained that the card constituted a "paper [or] effect" under article 1, section 7 of the Hawaiʻi Constitution and therefore the police were "required to obtain a warrant to obtain the information represented by the registration number of the gold card."

The Circuit Court of the First Circuit (the court [19]) concluded that the "inquiry to the Ala Moana GNC store in order to establish ownership of the GNC card ... was within the realm of the search warrant" because "[a] plain reading of the warrant and its specificity with respect to the contents and purposes including establishing the identification of the owner of the backpack" showed that the search was permissible. At trial, Walton was subsequently convicted of attempted murder in the second degree.[20]

**II.**

On appeal to the ICA, Walton again challenged the inquiry to GNC regarding the ownership of the card as unconstitutional. Walton again argued that police were re-

17. Walton's motion to suppress also asserted that police obtained his address from GNC, however, at trial police testified only that the inquiry to GNC revealed Walton's name.

18. It appears that no other evidence introduced at trial was the fruit of the search. In his Application, Walton does not identify any specific items introduced at trial that was a fruit of the search.

19. The Honorable Collette Y. Garibaldi presided.

20. At trial, Walton's co-defendant Courage Elkshoulder introduced a recording of a phone conversation where Walton allegedly confessed to stabbing CW. [Tr. 5/26/11, Dkt. 35:15] Elkshould-

er testified that he spoke to his attorney prior to recording the conversation. [Tr. 5/24/11, Dkt. 33:106] However, based on the attorney-client privilege, the court refused to allow Walton to cross-examine Elkshoulder or to examine Elkshoulder's attorney. [Tr. 5/26/11, Dkt. 35:8] Inasmuch as on remand Elkshoulder will not be Walton's co-defendant, it is not clear that the recorded conversation will be introduced into evidence. However, should the conversation be introduced, limitations on Walton's examination of Elkshoulder or his attorney would present serious constitutional issues. *See State v. Peseti*, 101 Hawaiʻi 172, 182, 65 P.3d 119, 129 (2003).

quired to obtain a search warrant to "learn the identity of the owner of the card by using the serial number on it." The ICA did not discuss the court's conclusion that the inquiry to GNC was "within the realm of the search warrant." Instead, the ICA determined that this search was not prohibited by article 1, section 7 of the Hawaiʻi Constitution because, *inter alia,* Walton "voluntarily disclosed [his name] to GNC as part of a business transaction." *Walton,* 2013 WL 2190159, at *5. In reaching this conclusion, the ICA relied on *Miller* and this court's decision in *State v. Klattenhoff,* 71 Haw. 598, 606, 801 P.2d 548, 552 (1990).

In *Miller,* in response to subpoenas,[21] the presidents of two different banks produced the defendant's "records of accounts," including "checks, deposit slips, [ ] financial statements, and [ ] monthly statements." 425 U.S. at 438, 96 S.Ct. 1619. The defendant challenged the subpoenas as invalid under the Fourth Amendment. *Id.* at 439, 96 S.Ct. 1619.

However, the Supreme Court rejected the defendant's contention that he had a legitimate expectation of privacy in the bank records. *Id.* at 442, 96 S.Ct. 1619. According to the Court, "[t]he checks are not confidential communications but negotiable instruments to be used in commercial transactions." *Id.* Additionally, "[a]ll of the documents obtained, including financial statements and deposit slips, contain only information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* The information was not protected by the United States Constitution because "the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him [or her] to government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the

confidence placed in the third party will not be betrayed." *Id.* at 443, 96 S.Ct. 1619.

However, the dissenting opinion in *Miller* referred to a California Supreme Court opinion where "[r]epresentatives of several banks testified . . . that information in their possession regarding a customer's account is deemed by them to be confidential." *Miller,* 425 U.S. at 450, 96 S.Ct. 1619 (Brennan, J., dissenting) (quoting *Burrows v. Superior Court,* 13 Cal.3d 238, 118 Cal.Rptr. 166, 529 P.2d 590, 593 (1974)). In that situation, " '[a] bank customer's reasonable expectation is that absent compulsion by legal process, the matters he reveals to the bank will be utilized by the bank only for internal banking purposes.' " *Id.* (quoting *Burrows,* 118 Cal. Rptr. 166, 529 P.2d at 593). Additionally, "the disclosure by individuals or business firms of their financial affairs to a bank is not entirely volitional, since it is impossible to participate in the economic life of contemporary society without maintaining a bank account." *Id.* at 451, 96 S.Ct. 1619 (quoting *Burrows,* 118 Cal.Rptr. 166, 529 P.2d at 596).

Finally, "[f]inancial transactions can reveal much about a person's activities, associations, and beliefs." *Id.* at 452, 96 S.Ct. 1619 (quoting *Burrows,* 118 Cal.Rptr. 166, 529 P.2d at 595). " 'To permit a police officer access to these records without any judicial control as to relevancy or other traditional requirements of the legal process, and to allow the evidence to be used in any subsequent criminal prosecution against a defendant, opens the door to a vast and unlimited range of very real abuses of police power.' " *Id.* at 451, 96 S.Ct. 1619 (quoting *Burrows,* 118 Cal.Rptr. 166, 529 P.2d at 596). Thus, Justice Brennan would have held that the bank records were entitled to Fourth Amendment protection.[22] *Id.* at 454, 96 S.Ct. 1619.

Similarly, in *Smith v. Maryland,* 442 U.S. 735, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979), the

---

**21.** The Fifth Circuit had concluded that the subpoenas did not "constitute adequate legal process" under the Fourth Amendment. *Miller,* 425 U.S. at 439, 96 S.Ct. 1619 (internal quotation marks omitted). The validity of the subpoenas was not discussed either by the majority or the dissents in light of the majority's conclusion that the Fourth Amendment did not apply. *See id.* at 446 n. 9, 96 S.Ct. 1619.

**22.** Justice Brennan also added that the California Supreme Court decision in *Burrows* "strikingly illustrates the emerging trend among high state courts of relying upon state constitutional protections pervading counterpart provisions of the United States Constitution, but increasingly being ignored by decisions of this Court." *Miller,* 425 U.S. at 454–55, 96 S.Ct. 1619 (Brennan, J., dissenting).

police, acting without a warrant, installed a "pen register" on the defendant's phone. *Id.* at 737, 99 S.Ct. 2577. The pen register revealed to law enforcement the numbers dialed by the defendant's phone. *Smith,* 442 U.S. at 741, 99 S.Ct. 2577. The Supreme Court rejected the defendant's claim that the warrantless installation of the pen register constituted an illegal search, because "[t]his Court consistently has held that a person has no legitimate expectation of privacy in the information he voluntarily turns over to third parties." *Id.* at 743–44, 99 S.Ct. 2577. The Court explained that when the defendant "used his phone, [he] voluntarily conveyed numerical information to his telephone company and 'exposed' that information to its equipment in the ordinary course of business." *Id.* at 744, 99 S.Ct. 2577. Thus, the court held that the Fourth Amendment did not protect the information recovered from the pen register. *Id.*

But, Justice Stewart's dissenting opinion argued that "it is simply not enough to say ... that there is no legitimate expectation or privacy in the numbers dialed [on a phone] because the caller assumes the risk that the telephone company will disclose them to the police." *Id.* at 747, 99 S.Ct. 2577 (Stewart, J., dissenting). According to Justice Stewart, no telephone user "would be happy to have broadcast to the world a list of the local or long distance numbers they have called," because "such a list ... easily could reveal the identities of the persons and the places called, and thus reveal the most intimate details of a person's life." *Id.* at 748, 99 S.Ct. 2577. Therefore, the "information obtained by pen register surveillance is information in which the telephone subscriber has a legitimate expectation of privacy." *Id.*

Additionally, Justice Marshall's dissenting opinion explained that "constitutional protections are not abrogated whenever a person apprises another of facts valuable in criminal investigations," because individuals may disclose information to a third party with the expectation that it will not be disclosed further. *Id.* at 748–49, 99 S.Ct. 2577 (Marshall, J., dissenting) (citations omitted). Justice Marshall also noted that "unless a person is

prepared to forgo use" of a telephone, which "for many has become a personal or professional necessity, he cannot help but accept the risk of surveillance." *Smith,* 442 U.S. at 750, 99 S.Ct. 2577 (Marshall, J., dissenting) (citation omitted). Thus, "[i]t is idle to speak of assuming risks in contexts where, as a practical matter, individuals have no realistic alternative." *Id.*

Justice Marshall explained that, "[m]ore fundamentally, to make risk analysis dispositive in assessing the reasonableness of privacy expectations would allow the government to define the scope of Fourth Amendment protections." *Id.* Thus, "law enforcement officials, simply by announcing their intent to monitor the content of random samples of first-class mail or private phone conversations, could put the public on notice of the risks they would thereafter assume in such communications." *Id.*

Justice Marshall reasoned that "whether privacy expectations are legitimate ... depends not on the risks an individual can be presumed to accept when imparting information to third parties, but on the risks he should be forced to assume in a free and open society." *Id.* For "those extensive intrusions that significantly jeopardize individuals' sense of security, more than self-restraint by law enforcement officials is required." *Id.* at 751, 99 S.Ct. 2577 (internal quotations marks, brackets, and punctuation omitted). In light of the "vital role telephonic communication plays in our personal and professional relationships," and "the First and Fourth Amendment interests implicated by unfettered official surveillance," Justice Marshall concluded that "[t]he use of pen registers ... constitutes such an extensive intrusion." *Id.* Accordingly, Justice Marshall "would required law enforcement officials to obtain a warrant before they enlist telephone companies to secure information otherwise beyond the government's reach." *Id.* at 752, 99 S.Ct. 2577.

In *State v. Rothman,* 70 Haw. 546, 779 P.2d 1 (1989), this court declined to adopt the Supreme Court's holding in *Smith. Rothman* held that under article 1, section 6 of the Hawaiʻi Constitution,[23] "persons using

---

23. Article 1, section 6 of the Hawaiʻi Constitution provides as follows:

The right of the people to privacy is recognized and shall not be infringed without the showing

telephones in the State of Hawaiʻi have a reasonable expectation of privacy, with respect to the telephone numbers they call on their private lines[.]" 70 Haw. at 556, 779 P.2d at 7. However, in *Klattenhoff*, decided in 1990, this court adopted *Miller*. *Klattenhoff*, 71 Haw. at 606, 801 P.2d at 548. This court stated that defendants had no reasonable expectation of privacy in bank records, inasmuch as "[t]he records are owned by the banks because they are business records, they are not the private papers of the account holder." *Id.* "These records contain information voluntarily conveyed to the banks and exposed to their employees in the ordinary course of business." *Id.* "Furthermore, '[t]he depositor takes the risk, in revealing his affairs to another, that the information will be conveyed to the government.'" *Id.* (quoting *Miller*, 425 U.S. at 443, 96 S.Ct. 1619). Therefore, this court held that "there is no reasonable expectation of privacy in bank records." *Id.*

### B.

More recently, it has been explained that the approach used in *Miller* and *Smith*, and previously adopted by this court in *Klattenhoff*, "is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks." *United States v. Jones*, — U.S. ——, 132 S.Ct. 945, 957, 181 L.Ed.2d 911 (2012) (Sotomayor, J., concurring). As declared by Justice Sotomayor, "[p]eople disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers." *Id.*

In *Jones*, the use of a GPS attached to the underside of a vehicle to gather 2000 pages of information about the defendant [24] led Justice Sotomayor to suggest that "some unique aspects of GPS surveillance ... will require particular attention" inasmuch as "GPS mon-

itoring generates a precise, comprehensive record of a person's public movements that reflects a wealth of detail about her familial, political, professional, religious, and sexual associations." *Id.* at 955. Moreover, "because GPS monitoring is cheap in comparison to conventional surveillance techniques, and by design, proceeds surreptitiously, it evades the ordinary checks that constrain law enforcement practices: limited police resources and community hostility." *Id.* (internal quotation marks omitted). In light of the immense amount of information that could be unprotected under the approach of *Miller* and *Smith*, Justice Sotomayor concluded that "it may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties." *Id.*

### III.

In assessing U.S. Supreme Court opinions construing the federal constitution, Justice Brennan suggested that "the decisions of the Court are not, and should not be, dispositive of questions regarding rights guaranteed by counterpart provisions of state law." William J. Brennan, *State Constitutions and the Protection of Individual Rights*, 90 Harv. L. Rev. 489, 502 (1977). Rather, "such decisions are not mechanically applicable to state law issues, and state court judges and the members of the bar seriously err if they so treat them." *Id.* In that regard, he advised that "although in the past it might have been safe for counsel to raise only federal constitutional issues in state courts, plainly it would be most unwise these days not also to raise the state constitutional questions." *Id.* Justice Brennan explained that "state court judges, and also practitioners, do well to scrutinize constitutional decisions by federal courts, for only if they are found to be logically persuasive and well-reasoned, paying due regard to precedent and the policies underlying specific constitutional guarantees, may they properly

---

of a compelling state interest. The legislature shall take affirmative steps to implement this right.
(Emphasis added.)

**24.** The police obtained a warrant commanding them to install the GPS locator within ten days

and in the District of Columbia. *Jones*, 132 S.Ct. at 947 (majority opinion). However, the police installed the GPS locator on the eleventh day, in Maryland. *Id.* Thus, the Government conceded that the warrant did not extend to the installation of the GPS locator. *Id.* at 947 n. 1.

claim persuasive weight as guideposts when interpreting counterpart state guarantees." *Id.*

■■■ The hazard in applying *Miller,* *Smith,* and *Klattenhoff* in the modern age is the fundamental incompatibility of those cases with the basic precepts of our jurisprudence. It is beyond question that "in the absence of a warrant or exigent circumstances, it is unreasonable for the government to search an area where a person has an expectation of privacy." *State v. Cuntapay,* 104 Hawai'i 109, 117, 85 P.3d 634, 642 (2004). In determining "when a person's expectation of privacy may be deemed reasonable," this court considers, first, if a defendant "exhibit[ed] an actual, subjective expectation of privacy" in the area searched, and second if "that expectation [is] one that society would recognize as objectively reasonable." [25] *State v. Bonnell,* 75 Haw. 124, 139, 856 P.2d 1265, 1273 (1993).

■■ The rule that an individual has no legitimate expectation of privacy in any information shared with a third party cannot be justified in all situations. As explained by Justice Marshall in *Smith,* "[p]rivacy is not a discrete commodity, possessed absolutely or not at all. Those who disclose certain facts to a bank or phone company for a limited business purpose need not assume that this information will be released to other persons for other purposes." *Smith,* 442 U.S. at 749, 99 S.Ct. 2577 (Marshall, J., dissenting) (emphasis added) (citations omitted). Hence, Justice Sotomayor stated that it cannot be said that "all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection." *Jones,* 132 S.Ct. at 957 (Sotomayor, J., concurring).

For example, although individuals share the addresses of each Web site they visit with their internet service provider, it is unlikely that "people would accept without complaint the warrantless disclosure to the Government a list [containing] every Web site they had visited in the last week, month, or year." *Jones,* 132 S.Ct. at 957 (Sotomayor, J., concurring). Thus, even when information is disclosed to a third party, individuals may retain an expectation that such information will not be disclosed to others for purposes other than that for which the information had already been revealed.

Moreover, *Miller, Smith,* and *Klattenhoff* incorrectly rely on the principle that individuals who convey information to a third party have assumed the risk of that party disclosing the information to the government. In our times individuals may have no reasonable alternative, *Smith,* 442 U.S. at 750, 99 S.Ct. 2577 (Marshall, J., dissenting), but to disclose confidential information to obtain a necessary service. *Jones,* 132 S.Ct. at 957 (Sotomayor, J., concurring).

■■ The decisions in *Miller* and *Smith,* and as adopted by this court in *Klattenhoff,* are inconsistent with the recognition that article 1, section 7 of the Hawai'i Constitution protects all areas in which an individual possesses a legitimate expectation of privacy.[26] Even when information is shared with a third

25. The exquisite and concise definition of privacy was set forth in *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), by Justice Harlan in concurrence: "My understanding of the rule that has emerged from prior decisions is that there is a twofold requirement, first that a person have exhibited an actual (subjective) expectation of privacy and, second, that the expectation by one that society is prepared to recognize as 'reasonable[,]'" thus identifying a subjective and an objective component of the privacy formulation. 389 U.S. at 361, 88 S.Ct. 507 (Harlan, J., concurring).

26. Relatedly, in *State v. Detroy,* 102 Hawai'i 13, 72 P.3d 485 (2003), this court relied in part on the U.S. Supreme Court's conclusion in *Kyllo v. United States,* 533 U.S. 27, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001), that thermal imagers were "not in general public use," 533 U.S. at 34, 121 S.Ct. 2038, in concluding that the use of thermal imagery was a search that required a warrant. *Detroy,* 102 Hawai'i at 21, 72 P.3d at 493. Unlike the U.S. Supreme Court, this court noted that "the wide use of a device such as a thermal imager" would not "be determinative of whether an individual's right to privacy is forfeited," but that "it may be a factor." *Id.* at 22 n. 11, 72 P.3d at 494 n. 11. However, individuals may retain a reasonable expectation that some searches will not be reasonable even if a technological device is in general public use. Thus, this court's reliance on the fact that thermal imagers were not widely available in *Detroy* would warrant reconsideration.

party, an individual may retain a legitimate expectation that such information will not be further disseminated for purposes other than those for which they were disclosed in the first place. *Jones*, 132 S.Ct. at 957 (Sotomayor, J., concurring); *Smith*, 442 U.S. at 749, 99 S.Ct. 2577 (Marshall, J., dissenting); *Miller*, 425 U.S. at 449, 96 S.Ct. 1619 (Brennan, J., dissenting). Thus, it cannot be said that information disclosed to another person automatically loses the protection it would otherwise receive under the Hawaiʻi Constitution. *Cf. Jones*, 132 S.Ct. at 957 (Sotomayor, J., concurring). As Justice Brennan maintained, "the very premise of the cases that foreclose federal remedies constitutes a clear call to state courts to step into the breach.... With federal scrutiny [of individual rights] diminished, state courts must respond by increasing their own."[27] Brennan, *State Constitutions*, 90 Harv. L. Rev. at 503.

Respectfully, based on the forgoing, the ICA erred in concluding that Walton lost all constitutional protection in his name simply because that information had been previously disclosed to a third party. *Walton*, 2013 WL 2190159, at \*5. Rather, under article 1, section 7 of the Hawaiʻi Constitution, it must be determined whether Walton held a legitimate expectation that such information would not be shared with others. *Jones*, 132 S.Ct. at 957 (Sotomayor, J., concurring); *Smith*, 442 U.S. at 749, 99 S.Ct. 2577 (Marshall, J., dissenting); *Miller*, 425 U.S. at 449, 96 S.Ct. 1619 (Brennan, J., dissenting). In making such a determination, this court should decide whether the individual considered such information to be private, *see Miller*, 425 U.S. at 449, 96 S.Ct. 1619 (Brennan, J., dissenting), whether that information reveals "intimate details of a person's life," *Smith*, 442 U.S. at 748, 99 S.Ct. 2577 (Stewart, J., dissenting), whether the individual released the information to a third party to obtain a necessary service, *Smith*, 442 U.S. at 750, 99 S.Ct. 2577 (Marshall, J., dissenting), whether there was no realistic alternative but to disclose the information, *id.*, and the extent to which disclosing such information would jeopardize an individual's sense of security.[28] *Id.* If such information is protected by article 1, section 7 of the Hawaiʻi Constitution, the State is not precluded from seeking to introduce such evidence at trial. Rather, the police simply must obtain a warrant before conducting such searches, thus subjecting the issue to the scrutiny of a

---

27. Soon and inevitably to come are overflights by drones—will they be too numerous in number to sustain a claim of any expectation of privacy? See Jonathan Olivito, Note, <u>Beyond the Fourth Amendment: Limiting Drone Surveillance Through the Constitutional Right to Informational Privacy,</u> 74 Ohio St. L.J. 669, 687 (2013). Contained within a person's luggage is not only its contents but an expectation of privacy. Yet, it is permissible for the police to legally ascertain the contents of a suitcase through a sniff by trained dogs of the air around the suitcase, because there is said to be no expectation of privacy in the air containing the odor of marijuana. *United States v. Place*, 462 U.S. 696, 707, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983). However, the use of a thermal imager in a marijuana—growing investigation to measure the heat emanating from the walls of a house, presumably in the air that might surround a suitcase, is said to violate one's privacy. *Kyllo*, 533 U.S. at 37, 121 S.Ct. 2038. But a swab of one's inner cheek to search for "DNA", is permissible, even if not connected to any crime because on balance the intrusion on a person is not discomforting and identification of an arrestee is a government interest that weighs more heavily, according to *Maryland v. King*, — U.S. ——, 133 S.Ct. 1, 183 L.Ed.2d 667 (2012).

28. This court, "[a]s the ultimate judicial tribunal with final, unreviewable authority to interpret and enforce the Hawaiʻi Constitution, [is] free to give broader protection than that given by the federal constitution." *Detroy*, 102 Hawaiʻi at 22, 72 P.3d at 494 (citations and internal quotation marks omitted). I would therefore conclude on independent state constitutional grounds, that information disclosed to third parties may be entitled to protection under article 1, section 7 of the Hawaiʻi Constitution.

It must be noted that "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). "If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached." *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). In consonance with *Long*, federal cases are cited in this opinion only for the purpose of guidance. The Hawaiʻi Constitution, as opposed to federal law, compels the result reached herein.

neutral disinterested magistrate before a search is conducted. *Cf. Katz*, 389 U.S. at 357, 88 S.Ct. 507 ("Bypassing a neutral predetermination of the scope of a search leaves individuals secure from Fourth Amendment violations only in the discretion of the police." (internal quotation marks and citation omitted)).

## IV.

█ Rapid changes in technology have altered our lifestyles, creating a dissonance between a mechanical application of the expectation of privacy test and its core meaning. The last fifty years have witnessed a significant period of change in the law pertaining to criminal procedure. United States Supreme Court and Hawai'i Supreme Court decisions have diverged [29] in the area of constitutional protections against unreasonable searches and seizures. But as noted, the U.S. Supreme Court itself recognized, "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Evans*, 514 U.S. at 8, 115 S.Ct. 1185.

█ The ascent of state supreme courts' independence in interpreting their own constitutions to afford more or broader rights to individuals than the national minimum standard established by the Supreme Court, so long as these decisions do not violate the federal constitution or statutes, reflects a "New Federalism." Brennan, *State Constitutions*, 90 Harv. L. Rev. at 501. In this context, the co-existence of two constitutions—the federal constitution and the state constitution—in one jurisdiction can result in contrasting outcomes in federal and state court, although arising out of the same or similar factual scenarios, with the concomitant effect on the duties and authority of law enforcement agencies affected by these decisions. *See Torres*, 125 Hawai'i at 397, 262 P.3d at 1021.

The modification or reformulation of a privacy test is possible, thus, at the state level. It would seem beyond purview that a reasonable person would not expect that disclosure to third parties would, *ipso facto*, permit government scrutiny or intrusion into otherwise protected privacy zones without at least some safeguards inhering in the checks among the separate branches of government. An expectation of privacy, even though extended to matters exposed to third persons, would be viewed as reasonable by society, where such exposure is inevitable and inescapable in the conduct of the necessary affairs of life. The alternative is to countenance the inexorable diminishment of personal privacy and the substantial risk of privacy zones disappearing altogether. *Cf. Griswold v. Connecticut*, 381 U.S. 479, 484, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965) (holding that "specific guarantees in the Bill of Rights have penumbras, formed by emanations from those guarantees that help give them life and substance," and that "[v]arious [constitutional] guarantees create zones of privacy," such as the Fourth Amendment's

---

**29.** The most significant difference between the Federal and Hawai'i decisions, to this point at least, is the Supreme Court's jettison of two of the three purposes of the exclusionary rule—protection of privacy and judicial integrity. The singular focus in *United States v. Leon*, 468 U.S. 897, 928–929, 104 S.Ct. 3430, 82 L.Ed.2d 677 (1984), on deterring police misconduct, *see id.* at 910, 104 S.Ct. 3430, upended the tripartite formulation established in *Mapp v. Ohio*, 367 U.S. 643, 659–60, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961). The result seemingly reads out of the Fourth Amendment the express requirement of probable cause for the issuance of warrants. Under *Leon*, insofar as a warrant seems valid on its face and the police thus, in "good faith," execute it—the evidence obtained is admissible without regard to whether the warrant is, as a matter of fact, supported by probable cause or not. 468 U.S. at 926, 104 S.Ct. 3405. On this development, Justice Brennan said, "in case af-

ter case, I have witnessed the Court's gradual but determined strangulation of the [exclusionary] rule." *Leon*, 468 U.S. at 928–929, 104 S.Ct. 3430 (Brennan, J., dissenting).

Under the Hawai'i Constitution it .has been held that "the three purposes underlying our exclusionary rule" are "judicial integrity, [the] protection of individual privacy, and [the] deterrence of illegal police misconduct." *State v. Torres*, 125 Hawai'i 382, 394, 262 P.3d 1006, 1019 (2011); *see also State v. Lopez*, 78 Hawai'i 433, 446, 896 P.2d 889, 902 (1995). *See State v. Matsunaga*, 82 Hawai'i 162, 168–69, 920 P.2d 376, 382–83 (App.1996) (the good faith exception to the warrant requirement is rejected under the Hawai'i Constitution); *compare State v. McKnight*, 131 Hawai'i 379, 399, 319 P.3d 298, 318, 2013 WL 6860774 at *17 (Dec. 31, 2013) (holding that an error by the issuing judge resulting in conflicting dates on the face of the warrant did not render a search warrant invalid).

"protection against all governmental invasions of the sanctity of a man's home and the privacies of life" (internal quotation marks omitted)).

The contours of an expectation of privacy in the context of disclosure to third persons would be shaped on a case-by-case basis as guided by the core values of personal dignity and security grounded in the privacy right. Considerations of purpose, history, logic, and precedent—accepted tools of constitutional construction—would be pertinent. As explained by Justice Brandeis, "[i]t is one of the happy incidents of the federal system that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." *New State Ice Co. v. Liebmann,* 285 U.S. 262, 311, 52 S.Ct. 371, 76 L.Ed. 747 (1932) (Brandeis, J., dissenting).

## V.

■ The concurring opinion's belief that there is no expectation of privacy in a name, under the facts, may be too broad a construct. One's identity is a gateway to information collected by third persons—some collection occurring even without a person's knowledge; only context can determine whether the disclosure of one's name would be the key that unlocks the door to a protected zone of privacy. For example, in *Hiibel v. Sixth Judicial Dist. Court of Nevada, Humboldt County,* 542 U.S. 177, 124 S.Ct. 2451, 159 L.Ed.2d 292 (2004), Justice Stevens rejected the Supreme Court's conclusion that the Fifth Amendment right against self incrimination did not extend to an individual's name.[30] *See* 542 U.S. at 195, 124 S.Ct. 2451 (Stevens, J., dissenting). Justice Stevens believed that it was "clear that the disclosure of [the defendant's] identity is protected" by the Fifth Amendment because "[a] person's identity obviously bears informational and incriminating worth, 'even if the name itself is not inculpatory.'" *Id.* at 196, 124 S.Ct. 2451 (internal brackets omitted) (quoting *United States v. Hubbell,* 530 U.S. 27, 38, 120 S.Ct. 2037, 147 L.Ed.2d 24 (2000)). Additionally, "[a] name can provide the key to a broad array of information about the person, particularly in the hands of a police officer with access to a range of law enforcement databases." *Id.*

However, it is unnecessary to decide whether, under the circumstances presented here, Walton possessed a legitimate expectation of privacy in his name because the introduction of that evidence at trial was plainly harmless.[31] In determining whether an error is harmless, this court considers whether "there is a reasonable possibility that error might have contributed to conviction." *State v. Machado,* 109 Hawai'i 445, 452–53, 127 P.3d 941, 948–49 (2006) (citations and internal quotation marks omitted). In the instant case, the association of Walton's name with the GNC card served only to establish his presence at the crime scene. However, that fact was also established by a wealth of other evidence presented at trial.[32] Thus, the in-

---

**30.** In *Hiibel,* the defendant was arrested pursuant to a Nevada statute requiring an individual detained by a police officer to identify himself or herself to the officer. 542 U.S. at 181, 124 S.Ct. 2451. The defendant argued, *inter alia,* that the statute violated "the Fifth Amendment's prohibition on compelled self-incrimination." *Id.* at 189, 124 S.Ct. 2451.

**31.** Additionally, by leaving the backpack and the GNC card at the scene Walton may have abandoned the card and thus relinquished any expectation of privacy he had in the card. *Cf. State v. Kolia,* 116 Hawai'i 29, 35–36, 169 P.3d 981, 987–88 (App.2007) (holding that a defendant abandoned a fanny pack by throwing it away while fleeing from police).

**32.** A surveillance camera captured an image of Walton entering the taxi where the stabbing occurred, and the taxi driver identified that image as being one of the perpetrators. Subsequently, in response to a "Crime Stoppers" tip, two of Walton's co-workers identified him as the individual in the picture. Most significantly, Walton's co-defendant Elkshoulder, also admitted that Walton was present at the scene of the crime. None of this evidence was related to the inquiry to GNC, inasmuch as the Crime Stoppers tip was circulated independently and Elkshoulder turned himself in.

In light of the evidence connecting Walton to the crime scene, it cannot be said that there is a reasonable possibility that the introduction of the name connected to the GNC card contributed to Walton's conviction. *Machado,* 109 Hawai'i at 452–53, 127 P.3d at 948–49; *see also Territory v. Chang Tai Kun,* 26 Haw. 133, 136 (Terr.1921) ("[T]he only effect detrimental to the defendant which this evidence could have had would be to show that there had been gambling carried on at the premises in question and [] <u>this fact is so thoroughly proven by other evidence in the case</u> that it could not have affected the verdict and

troduction of the information obtained from the inquiry to GNC regarding the ownership of the GNC card was harmless.

## VI.

Based on the foregoing, the court's September 7, 2011 order denying Walton's motion to suppress his name as obtained through the use of the GNC card is affirmed, but for the reasons set forth herein.

Concurring Opinion to Part II by RECKTENWALD, C.J., in which NAKAYAMA, J., joins.

The majority concludes that "it is unnecessary to decide whether, under the circumstances presented here, Walton possessed a reasonable expectation of privacy in his name because the introduction of that evidence at trial was plainly harmless." Majority Op. at 99, 324 P.3d at 909. In my view, however, the circuit court correctly denied Walton's motion to suppress identification evidence obtained from the business records of General Nutrition Center (GNC) because Walton had no reasonable expectation of privacy in his name in the circumstances of this case.

Walton argues that the police conducted an illegal search in using a GNC card found in a backpack recovered from the complaining witness's (CW) taxi to obtain his name.[1] The GNC card did not include Walton's name on its face, but included a membership number. Detective Ogawa then contacted a local GNC franchise and learned that the card's membership number was registered in Walton's name.

Walton argues that in contacting GNC to obtain his name, without a warrant specifically authorizing such an inquiry, the police violated the Fourth Amendment of the United States Constitution and article 1, section 7, of the Hawai'i Constitution. Specifically, Walton argues that he had a "reasonable expectation of privacy in the information on his GNC card as being protected by the Hawaii Constitution's enshrinement of privacy rights for non-regulated documents con-

cerning his personal affairs." Walton's argument is unfounded because he had no reasonable expectation of privacy in the information obtained from GNC, i.e., his name.

"It is well settled that an area in which an individual has a reasonable expectation of privacy is protected by the fourth amendment of the United States Constitution and by article 1, § 7 of the Hawai'i Constitution and cannot be searched without a warrant." State v. Biggar, 68 Haw. 404, 407, 716 P.2d 493, 495 (1986) (citing Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); State v. Wong, 68 Haw. 221, 708 P.2d 825 (1985); State v. Stachler, 58 Haw. 412, 570 P.2d 1323 (1977)). When a governmental intrusion does not invade an individual's legitimate expectation of privacy, however, there is no "search" subject to the Warrant Clause. State v. Meyer, 78 Hawai'i 308, 312, 893 P.2d 159, 163 (1995). In determining whether an individual's expectation of privacy brings the governmental activity at issue within the scope of constitutional protection, this court employs a two-part test. First, the person must exhibit an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable. State v. Hauge, 103 Hawai'i 38, 50–51, 79 P.3d 131, 143–44 (2003). The question here is whether Walton's name, standing alone, is entitled to protection under the Fourth Amendment of the United States Constitution and article 1, section 7, of the Hawai'i Constitution.

As courts have recognized, "not all information about a person is private in the Fourth Amendment sense." Commonwealth v. Duncan, 572 Pa. 438, 817 A.2d 455, 463 (2003) (quoting Wayne R. LaFave, 1 Search and Seizure § 2.7(c) (5th ed. 2012)); State v. Chryst, 793 P.2d 538, 541–42 (Alaska Ct.App. 1990) (same). Thus, allowing law enforcement agents "to consult business records that merely [reveal] a person's name or address or telephone number ... does not offend any interests protected by the Fourth Amendment." Duncan, 817 A.2d at 463

was therefore not prejudicial to the rights of the defendant." (emphasis added)).

1. Although Walton claims that the police also obtained his address from GNC's records, Detective Ogawa testified only that he obtained Walton's name from GNC.

(quoting LaFave, 1 *Search and Seizure* § 2.7(c)); *Chryst*, 793 P.2d 538 (same).

In *Duncan*, for example, the Supreme Court of Pennsylvania confronted a situation directly analogous to the one presented here. In that case, police learned that the defendant, who was suspected of raping a woman, had attempted to make a purchase using an ATM card. *Duncan*, 817 A.2d at 457. Without obtaining a warrant, the police called the bank that issued the ATM card and learned the defendant's name and address. *Id.* The defendant was later arrested and charged in connection with the rape. *Id.* Defendant then sought to suppress blood, bodily fluid, and hair samples, and an out-of-court identification that had been obtained by the police, arguing that the name and address information disclosed by the bank was protected under a state constitutional right of privacy, and that the evidence was therefore the fruit of an unconstitutional search. *Id.*

In rejecting this argument, the *Duncan* court noted that the "police asked the bank only for the name and address that corresponded to the [defendant's] ATM card number—which the police had already obtained from a third party—and the bank gave them *only* that information." *Id.* at 462 (emphasis in original). The court further observed that the police

> did not seek evidence of a crime reposing hidden within the bank's financial documents. Rather, they were looking for the mere <u>identity</u> of the person they had strong reason to believe had forcibly raped a woman, and who had attempted to use a precisely identified ATM card. To that

end, they telephoned appellant's bank, and were told his name and address.

*Id.* (emphasis in original).

The court explained that a "person's name and address do not, by themselves, reveal anything concerning his personal affairs, opinions, habits or associations." *Id.* at 463 (quotation marks omitted). The court concluded, therefore, that the defendant did not have a right of privacy in the name and address information disclosed by his bank to the police. *Id.*[2]

Here, Walton did not have a reasonable expectation of privacy in the information obtained from GNC, i.e., his name. Like in *Duncan*, the police obtained only the name associated with the GNC card; the police had recovered that card after searching a backpack abandoned at the scene of the crime. The police did not seek evidence from GNC relating to the stabbing of CW or Walton's activities at GNC, they merely sought to determine the <u>identity</u> of the person associated with the GNC card, and that is all the police obtained from GNC. In these circumstances, Walton had no reasonable expectation of privacy in the information obtained from GNC.

Moreover, Walton failed to demonstrate that he had both a subjective expectation of privacy in his name, and that such an expectation is one that society would recognize as objectively reasonable. *See Hauge*, 103 Hawai'i at 50–51, 79 P.3d at 143–44. With respect to the subjective prong of this test, Walton offered no evidence that he believed that GNC would keep his name private, nor did he offer any evidence suggesting that GNC customers generally expect the names associated with membership cards to be kept private.[3] *See Duncan*, 817 A.2d at 464.

---

2. The *Duncan* court distinguished its prior decision in *Commonwealth v. DeJohn*, 486 Pa. 32, 403 A.2d 1283 (1979), in which the court had held that bank customers have a legitimate expectation of privacy in records <u>pertaining to their affairs</u> kept at a bank. *Duncan*, 817 A.2d at 463. In *DeJohn*, the Pennsylvania Supreme Court rejected the analysis set forth by the Supreme Court in *United States v. Miller*, 425 U.S. 435, 443, 96 S.Ct. 1619, 48 L.Ed.2d 71 (1976), in which the Court held that a defendant has no reasonable expectation of privacy in his personal bank records. *DeJohn*, 403 A.2d at 1290. In *State v. Klattenhoff*, 71 Haw. 598, 605–06, 801 P.2d 548, 552 (1990), this court adopted the rule set forth in *Miller*. However, the holding in *Klattenhoff* is not implicated in the instant case

because the police obtained only Walton's name from GNC, and not any information relating to his private affairs.

3. This case is therefore distinguishable from other cases in which individuals took affirmative steps to protect their anonymity. *See, e.g., People v. Chapman*, 36 Cal.3d 98, 201 Cal.Rptr. 628, 679 P.2d 62, 67–68 (1984) ("by affirmatively requesting and paying an extra service charge to the telephone company to keep her unlisted information confidential, respondent took specific steps to ensure greater privacy than that afforded other telephone customers"), <u>disapproved on other grounds by</u> *People v. Palmer*, 24 Cal.4th 856, 103 Cal.Rptr.2d 13, 15 P.3d 234 (2001); *State v. Butterworth*, 48 Wash.App. 152, 737 P.2d 1297, 1300 (1987) (noting that individual "specifically

Walton also failed to demonstrate that any subjective expectation of privacy he may have held in his name is one that society would recognize as objectively reasonable. As the court explained in *Duncan,*

> Whether registering to vote, applying for a driver's license, applying for a job, opening a bank account, paying taxes, etc., it is all but impossible to live in our current society without repeated disclosure of one's name and address, both privately and publicly. There is nothing nefarious in such disclosures. An individual's name and address, by themselves, reveal nothing about one's personal, private affairs. Names and addresses are generally available in telephone directories, property rolls, voter rolls, and other publications open to public inspection. In addition, it has become increasingly common for both the government and private companies to share or sell name and address information to unaffiliated third-parties.... In this day and age where people routinely disclose their names and addresses to all manner of public and private entities, this information often appears in government records, telephone directories and numerous other documents that are readily accessible to the public, and where customer lists are regularly sold to marketing firms and other businesses, an individual cannot reasonably expect that his identity and home address will remain secret-especially where, as here, he takes no specific action to have his information treated differently and more privately.

817 A.2d at 455–56.

For the foregoing reasons, Walton did not have a reasonable expectation of privacy in the information (i.e., his name) obtained by the police from GNC. The circuit court therefore correctly denied Walton's motion to suppress with respect to the information obtained from GNC.

requested privacy regarding his address and telephone number in asking for an unpublished listing'').